JAMES BRADLEY, *Plaintiff in Error,* v. THE STATE OF FLOR-
IDA, *Defendant in Error.*

Opinion Filed April 26, 1920.

Petition for rehearing denied June 10, 1920.

1.  The intent of a statute is the law.

2.  A statury definition of a felony should not by construction
    or interpretation be extended to cover acts or omissions of
    persons that are not within the intent of the statute, for the
    lawmaking power can legally designate or define the criminal
    offenses for which penalties may be imposed.

3.  Where the charge is a crime it must have clear legislative
    basis.

4.  It is the Legislature, not the court, which is to define a crime,
    and ordain its punishment.

5.  It is necessary that a sufficient statutory authority should
    exist for declaring any act or omission a criminal offense.

6.  It is axiomatic that statutes creating and defining crimes can-
    not be extended by intendment, and that no act, however
    wrongful, can be punished under such a statute unless clearly
    within its terms.

7.  There can be no constructive offenses, and before a man can
    be punished, his case must be plainly and unmistakably with-
    in the statute.

8.  The failure or refusal of a father to provide medical at-
    tention for his child who was accidentally burned by falling
    in a fire, from which burns the child subsequently died, does
    not make the father guilty of the crime of manslaughter de-
    fined by statute to be "the killing of a human being by the
    act, procurement or culpable negligence of another."

A Writ of Error to the Circuit Court for Suwannee County; M. F. Horne, Judge.

Judgment reversed.

*H. E. Carter,* for Plaintiff in Error;

*Van C. Swearingen,* Attorney General, and *D. Stuart Gillis,* Assistant, for the State.

WHITFIELD, J.—The portions of the indictment that are material here are as follows: "That James Bradley, late of said county, on the 30th day of April, A. D. 1918, in the County of Suwannee and State of Florida, was the father of a child under the age of 21 years, to-wit, Bertha Bradley, and was under the legal duty and obligation to provide for the said Bertha Bradley necessary clothing, shelter, protection, medical attention, treatment and care, and that said James Bradley then and there had the means and ability to provide the same and that the said Bertha Bradley was then and there weak, ill, feeble, suffering from serious burns, destitute, infirm and unable to care for herself and to procure for herself necessary medical treatment, care and attention; and he the said James Bradley did then and there unlawfully, feloniously and by culpable negligence wilfully neglect and refuse to provide the necessary medical treatment, care and attention for the said Bertha Bradley's health and comfort, whereby the health and bodily affliction of the said Bertha was greatly injured and accelerated; and he the said James Bradley afterwards, to-wit, on the next succeeding day and on every day between the said day first named and on the day of the death of the said Bertha Bradley hereafter to be mentioned, did then and there unlawfully,

feloniously, and by culpable negligence, refuse and neglect
to provide her the said Bertha Bradley with the neces-
sary medical treatment, care and attention·necessary for
the safe-guarding and protection of the health and life
of her the said Bertha Bradley, the said James Bradley
being then and there on all said days and times the father
of the said Bertha Bradley and then and there having
the means to provide the said Bertha Bradley the neces-
sary medical treatment, care and attention, and being
under the legal duty and obligation to provide the same
as aforesaid, and she, the said Bertha Bradley, then and
there having no means to provide the same as aforesaid
and being then and there weak, ill, feeble, suffering from
serious burns, destitute and infirm as aforesaid; by rea-
son whereof the said Bertha Bradley did then and there
on all days and times before mentioned until the 22nd
day of June, A. D. 1918, did sicken and languish with a
mortal sickness and feebleness of body so as aforesaid
created, produced and accelerated by the culpable neglect
aforesaid of the said James Bradley and by the cul-
pable and unlawful refusal and neglect of the said James
Bradley to provide her the said Bertha Bradley with the
necessary medical treatment, care and attention, until
on the said 22nd day of June, A. D. 1918, in the county
of Gadsden, and State of Florida, at which last men-
tioned place the said Bertha Bradley had been removed
for treatment, the said Bertha Bradley of and from said
mortal sickness created, produced and accelerated by said
culpable neglect of said James Bradley as aforesaid did
then and there die; and so the said James Bradley her
the said Bertha Bradley in manner and form and by the
means and culpable neglect aforesaid did unlawfully kill
and slay."

To a judgment of conviction imposing a penalty for manslaughter the defendant took writ of error.

Section 3209, General Statutes, 1906, enacts that: "The killing of a human being by the act, procurement or culpable negligence of another, in cases where such killing shall not be justifiable or excusable homicide nor murder, according to the provisions of this article, shall be deemed manslaughter, and shall be punished by imprisonment in the State prison not exceeding twenty years, or imprisonment in the county jail not exceeding one year, or by fine not exceeding five thousand dollars."

This is not a charge that the father did "wilfully deprive his child of necessary medical attention" under Section 3238, General Statutes, 1906. Section 3209 does not refer to Section 3238 in defining the crime of manslaughter.

The intent of a statute is the law. A statutory definition of a felony should not by construction or interpretation be extended to cover acts or omissions of persons that are not within the intent of the statute, for only the lawmaking power can legally designate or define the criminal offenses for which penalties may be imposed. Milton v. State, 40 Fla. 251, 24 South. Rep. 60; 16 C. J. 65; State v. Fontenot, 112 La. 628, 36 South. Rep. 630; Ex parte Bailey, 39 Fla. 734, 23 South. Rep. 552. "Where the charge is a crime it must have clear legislative basis." United States v. George, 228 U. S. 14, text 22, 33 Sup. Ct. Rep. 412. "It is the legislature, not the court, which is to define a crime, and ordain its punishment." United States v. Wiltberger, 5 Wheat. (U. S.) 76, text 95. "It is necessary that a sufficient statutory authority should exist for declaring any act or omission a criminal offence." United States v. Eaton, 144 U. S. 677, 12 Sup. Ct. Rep. 764. "It

is axiomatic that statutes creating and defining crimes cannot be extended by intendment, and that no act, however wrongful, can be punished under such a statute unless clearly within its terms. 'There can be no constructive offences, and before a man can be punished, his case must be plainly and unmistakably within the statute." United States v. Lacher, 134 U. S. 624; Endlich on the Interpretation of Statutes, Sec. 329, 2nd ed.; Pomeroy's Sedgwick on Statutory and Constitutional Construction, 28." Todd v. United States, 158 U. S. 278, text 282, 15 Sup. Ct. Rep. 889.

There is no statute in this State specifically making the failure or refusal of a father to provide medical attention for his child, a felony, and the general definition of manslaughter contained in the statute, does not appear to cover a case of this nature. Neither the allegations of the indictment nor the evidence adduced at the trial show "the killing of" the child "by the act, procurement or culpable negligence of" the father. Whatever motive may have prompted the father in failing and refusing to provide medical attention for his severely burned daughter, such failure and refusal, however reprehensible, does not appear to be within the letter or intent of the statute making "the killing of a human being by the act, procurement or culpable negligence of another," a felony called manslaughter. It is not claimed that the allegations and proofs show that any "act" or "procurement" of the father caused the death of the child. Nor can it be fairly said that the allegations or proofs show that any "culpable negligence" of the father caused "the killing of" the child. Manifestly the death of the child was caused by the accidental burning in which the father had no part. The attentions of a physician may or may not have prevented the burning from causing the death of the child; but the

absence of medical attention did not cause "the killing" of the child, even if the failure or refusal of the father to provide medical attention was "culpable negligence" within the intent of the statute. This case is essentially different from Hampton v. State, 50 Fla. 55, 39 South. Rep. 421.

Judgment reversed.

BROWNE, C. J., AND TAYLOR AND ELLIS, J. J., concur.

WEST, J., dissents.

BROWN, C. J., Concurring.—I fully concur in the decision and opinion in this case.

The question of the father's religious belief is in no wise involved.

The all-important question is, must a parent call a physician every time his child is sick, or risk being adjudged guilty of manslaughter if the child should die? If not, who is to decide when the child is sick enough to place upon the father the obligation to call a physician? Is it the father, or the neighbors, or must the father call a physician to ascertain if the child needs a physician?

Has the practice of medicine become an exact science, so that after death, human testimony can establish beyond a reasonable doubt that if a physician had been called the child would not have died?

Does the duty of a parent to call a physician attach where a child is afflicted with a necessary fatal ailment, such as consumption, and continue until death occurs? Can the law fix what class of ailments a child must be

suffering from before the failure to call a physician becomes culpable negligence, so that if death ensues in one class it is manslaughter and in another class it is not? Shall a parent who belongs to that exemplary band of Christians who have no faith in the efficacy of medicine as a curative agency, be convicted of manslaughter, because he fails to call a physician to attend a sick child that subsequently dies? Until the practice of medicine becomes an exact science so that it can be established beyond the peradventure of a doubt that death would not have ensued if a physician had been in attendance, I think the answer to all these questions must be an unqualified "NO."

The reasoning upon which the State's case rests is this; the child was badly injured; it did not have medical attention for three weeks; after that it was in the care of a physician for two weeks before it died; if the father had called a physician it would have recovered; therefore the refusal of the father to call a physician caused the child's death. The fallacy of this is that it was not proven, and was not capable of being proven that if the child had had medical attention it would have recovered. And that must always be the fallacy in an attempt to attach the guilt of manslaughter to a father for failing to call a physician whenever his·child is sick, if it subsequently dies.

WEST, J., dissenting.—All the essential elements of the offense charged in the indictment in this case were proved. It was proved that the child of defendant who was burned was less than sixteen years of age, that she was an epileptic, and that in a paroxysm occasioned by this malady she fell unconscious into a fire and was very seriously burned. This injury was sustained on the 26th

42—Vol. 79

day of April, 1918. From that time till the 30th day of May following she remained at the home of defendant, at which time she was sent to the Florida Hospital for Insane at Chattahoochee, where she died on the 22nd day of June, 1918. From the time she was taken into custody by the hospital authorities she received treatment from physicians. Before that time she had received no such treatment. At the trial the physicians who treated her testified that her death resulted from the burn and that in their opinion if she had received medical attention promptly after being burned she would have recovered.

During the time that his daughter was still at his home defendant declined to secure for her the services or treatment of a physician, although he was urged to do so and was able to pay for such services and treatment. He also refused to permit others, who offered, to send a physician to give her treatment. The reason given by defendant for not calling a physician was, to quote from the evidence given by him, that "We were trusting to the Lord and looking to the Lord and believing in divine healing, and trusting to the Lord for the healing of the body." "I believed that I was doing all that God required me to do; I had the saints and elders pray for her which we did twice a day and annointed her with oil." "According to my knowledge of the word of God I was" doing all that was necessary. "James says, if any one is sick let him call for the elders of the church and let them pray over him, annointing him with oil in the name of the Lord, and the prayer of faith shall save him." (Epistle of James, 5:14-15).

He professed great affection for his daughter, declared that he did not intend to neglect her, and asserted that he was "doing all that God required him to do." He ad-

mitted that physicians knew more about the treatment
of burns than he did and that he declined to call a
physician to give his daughter treatment.

The question necessary to be considered. for a proper
determination of the case is, whether the facts make a
case of manslaughter within the terms of the statute,
and, if so, is the belief of defendant in "divine healing,"
as he expressed it, a sufficient justification of excuse for
his failure to secure any medical treatment for his daugh-
ter, who admittedly was very seriously burned.

The following extracts from the evidence will show
something of the nature of the case: F. S. Sanchez, a State
witness, testified that he saw the burned child about a
week after she was burned.   At that time he found she
was seriously burned.   Later, something like two weeks
after the burn, he again visited the home of defendant
and describes the conditon of the child as follows: "When
I got there the child was plumb raving crazy, apparently;
she didn't know anybody and was biting herself and tear-
ing up the bedclothes, and they were rubbing her and I
had to help hold her on the bed.   They claimed that God
had done healed her, said Glory to God it would never
have another pain.   It made me so mad that I could hard-
ly stand it, to see that child suffer like she was and they
saying that, and I said, well I hope so, but, gentlemen,
that poor child.   When it had three or four more fits like
it was having, but it was the horriblest thing I ever saw
and I just had to harness my horse and go on home."
This witness spoke to the defendant upon this visit about
a doctor for the child.   His testimony on this point is as
follows: "I tackled Mr. Bradley about having the doctor
to her, and I said, Jim, let's have a doctor to her, and he
said, O Glory to God, all the doctor I want is Jesus; I

got Jesus. He is the greatest physician of all. He has promised to do it all, and he placed his hands on her and was praying. I said, Jim, He ain't promised to do it all, and he said doctors are for people who ain't got Jesus; I tried to argue and persuade him and told him I knew that Jesus was the great doctor, but there were some on earth, and he said, Frank, I would rather follow her to the grave than to have one come in this house. I said, Jim, it's up to you. I stayed there the rest of the night and at the break of day I went on home and I couldn't get him to do anything at all, and later on I got other people to see if they could prevail on him to have a doctor as something had to be done." Later this witness, who was a brother-in-law of defendant, instituted some proceeding in a Justice of the Peace Court against him. Afterwrads he saw the defendant when, according to his evidence, the following conversation occurred between them: "I went to him and told him, Jim, now here, I didn't want to do this, but my sister and her little children must have some protection and if you will just agree to have a doctor, or give that child medical aid, I will drop it, and I will pay for it, if it takes the best horse I have on my place to do it. If you will just agree to do it I will send the doctor myself and pay him. He said Glory to God, I am able to pay a doctor. He said it is doing fine, Glory to God, I am in Daniel's path. Then, I said, Jim, I will tell you what else. If you will just agree to have a doctor go there and examine that child, and if that doctor comes back and says that she is getting on fine, then I will drop the matter right where it is." He also testified that defendant was himself able to secure the services of a physician and that the child had no property of her own.

Another State witness, T. L. Dorsett, the Justice of the Peace before whom the proceeding was instituted, gave the following testimony: "I spoke to Bradley about the matter and told him that it had created a great deal of talk, and he said that he knew that Frank had sworn out the papers, and I told him that I wanted to talk to him as a friend and not as an officer, and if he would agree to have a doctor, that I would send one out there and assist him in any way that I could, and also the Red Cross ladies had offered their services to help him with the nursing, and that I wanted him to have the doctor and keep down the talk anyway and the trouble, and he told me, Tom, when I became converted, I laid all that I possess on earth on God's altar and the greatest physician is God and I am praying over the child and no physician on earth could save her if God saw fit to take her, and if it is His will that she gets well she will get well, but if not, of course, He will take her. I saw that it was no use to argue with them; that was his religion and I didn't say any more to him about it." "He said that he didn't want any doctor; that the greatest physician was God himself."

The indictment is based upon Section 3209, General Statutes of Florida, idem Florida Compiled Laws, the general manslaughter statute, which is as follows: "The killing of a human being by the act, procurement or culpable negligence of another, in cases where such killing shall not be justifiable or excusable homicide nor murder, according to the provisions of this article, shall be deemed manslaughter, and shall be punished by imprisonment in the State prison not exceeding twenty years, or imprisonment in the county jail not exceeding one year, or by fine not exceeding five thousand dollars."

Whether defendant's conduct amounts to culpable negligence depends largely upon the answer to the question, what was his legal duty under the circumstances, bearing in mind that the injured person was a child of defendant, afflicted, and under sixteen years of age.

This court has said that "culpable negligence does not necessarily result from an intentional act. If the killing was by 'culpable negligence' then it was not necessarily intentional." Kent v. State, 53 Fla. 51, 43 South. Rep. 773. It has also been held that an indictment and conviction of a physician for manslaughter under this statute may be upheld when death results from his criminal negligence in the treatment of a case and that his criminal liability is not dependent on whether or not he "is a duly licensed practitioner, or merely assumes to act as such, *acted with good intent in administering the treatment and did so with the expectation that the result would prove beneficial.*" (italics supplied). Hampton v. State, 50 Fla. 55, 39 South. Rep. 421.

That it is the legal duty of a father, who is able to do so, to furnish necessary medical attention for his child seems to be well settled. Failure to do so is made a misdemeanor by Section 3238, General Statutes of Florida, idem Florida Compiled Laws. "Necessaries" for which an infant may legally bind himself are said in Coke on Littleton, 172 A, to be "his necessary meat, drink, apparel, necessary physic and such other such necessaries."

In 20 R. C. L. 625, it is said that "medical care, under the old-fashioned term 'physic,' was included among necessaries as long ago as Lord Coke's time and that such care, when needed, is the proper subject of recovery in a civil action, has never been doubted."

In Schouler's Domestic Relations the author says, "food, lodging, clothes, medical attention, and education, to use concise words, constitute the five leading elements in the dictrine of the infant's necessaries."

"That the services of a physician are necessary when a child is sick to the extent that such services ought to be had goes without saying." Rodgers' Domestic Relations, No. 448.

In the case of Rex v. Lewis, 6 Ont. L. Rep. 132, I British Ruling Cases 732, the court, in construing a section of the criminal code which enacts that every one who has charge of any other person unable by reason of detention, age, sickness, insanity, or any other cause, to withdraw himself from such charge, is under the legal duty to supply such persons with the necessaries of life, held, that the word "necessaries" included, medical aid, assistance, care and treatment.

Since it was the legal duty of the father to furnish to his child "necessaries" which include appropriate medical aid and treatment, taking into consideration the character of the injury in this case, it was culpable negligence, within the meaning of that term as used in the statute, not to furnish such aid and treatment, and his failure to do so renders him amenable to its provisions and his conviction of manslaughter under it may, in my judgment, be upheld.

Having concluded that the allegations of the indictment are sufficient under the statute to charge the offense of manslaughter, I pass to the next inquiry, namely, was the defendant's belief in "divine healing," as stated by him, any sufficient warrant in law for his failure and refusal to secure medical treatment for his injured

child, and does such belief justify and excuse him from the performance of a legal duty when it is proved to the satisfaction of the jury, as it evidently was in this case, that his failure and refusal to secure such medical attention resulted in the death of the child.

In the case of Rex v. Lewis, *supra*, a case similar in many respects to this case, where a like defense was interposed, the court said: "The law of the land is paramount and it is not for people to set themselves up in opposition to it; that the law of the land must be obeyed and it must be obeyed even though there be something in the shape of belief in the conscience of the person which would lead them to obey what in his state of mind he may consider a higher power or higher authority. And especially must there be obedience where, as in this instance, the subject of the judgment to be exercised is a child of tender years, unable to exercise any judgment of his own. In one form or another it has been frequently said by able judges, and it cannot be too widely known or too often repeated, that where an offense consists of a positive act, which is knowingly done, the offender can not escape punishment because he holds a belief which impels him to think that the law which he has broken ought not to exist or ought never to have been made."

In the case of The Queen v. Senior, 1 Queen's Bench Division 283, the court, in an opinion by Lord Russell, Chief Justice, said: "At the present day, when medical aid is within the reach of the humblest and poorest members of the community, it cannot be reasonably be suggested that the omission to provide medical aid for a dying child does not amount to neglect. Mr. Sutton contended that because the prisoner was proved to be an affectionate parent, and was willing to do all things for

the benefit of his child, except the one thing which was necessary in the present case, he ought not to be found guilty of the offense of manslaughter, on the ground that he abstained from providing medical aid for his child in consequence of his peculiar views in the matter; but we cannot shut our eyes to the danger which might arise if we were to accede to that argument, for where is the line to be drawn? In the present case the prisoner is shown to have had an objection to the use of medicine; but other cases might arise, such, for instance, as the case of a child with a broken thigh, where surgical operation was necessary, which had to be performed with the aid of an anaesthetic; could the father refuse to allow the anaesthetic to be administered? Or take the case of a child that was in danger of suffocation, so that the operation of tracheotomy was necessary in order to save his life, and an anaesthetic was required to be administered."

In the case of People v. Pierson, 176 N. Y. 201, 68 N. E. 243, the court said: "The peace and safety of the state involves the protection of the lives and health of its children as well as the obedience to its laws. Full and free enjoyment of religious profession and worship is guaranteed, but acts which are not worship are not. A person cannot, under the guise of religious belief, practice polygamy and still be protected from our statutes constituting the crime of bigamy. He cannot, under the belief or profession of belief that he should be relieved from the care of children, be excused from punishment for slaying those who have been born to him. Children when born into the world are utterly helpless, having neither the power to care for, protect or maintain themselves. They are exposed to all the ills to which flesh is heir, and require careful nursing, and at times, when danger is present, the help of an experienced physician. But the law

of nature, as well as the common law, devolves upon the parents the duty of caring for their young in sickness and in health, and of doing whatever may be necessary for their care, maintenance and preservation, including medical attendance if necessary, and an omission to do this is a public wrong which the State, under its police powers, may prevent."

It is true that some of the cases cited from other jurisdictions are based upon statutory provisions making it a crime for a parent to refuse or omit, without lawful excuse, to furnish food, clothing, shelter and medical attention to his child. But, if I am right in concluding that the manslaughter statute quoted above is sufficient to cover this case, then the principle announced in the cases cited is applicable.

The question of whether or not religious belief is a good defense upon a charge of violation of the Sunday laws involves a principle similar to that involved in this case. In a case in the Supreme Court of Arkansas, Scoles v. State, 47 Ark. 476, 1 S. W. Rep. 769, in which the validity of such a law was involved, the court said: "The appellant's argument then is reduced to this: that, because he conscientiously believes that he is permitted by the law of God to labor on Sunday he may violate with impunity a statute declaring it unlawful to do so. But a man's religious belief cannot be accepted as a justification for his committing an overt act made criminal by the law of the land." In support of this holding the court cited the case of Reynolds v. United States, 98 U. S. 145. That was a case in which the defendant was convicted upon an indictment charging him with bigamy. His defense was that the practice of polygamy was an accepted doctrine of the church of which he was a member, that

it was enjoined by different books which the members of said church believed to be of divine origin and that he had received permission from the church to enter into polygamous marriage. After holding the statute forbidding such marriage valid, the court said: "This being so, the only question which remains is, whether those who make polygamy a part of their religion are excepted from the operation of the statute. If they are, then those who do not make polygamy a part of their religious belief may be found guilty and punished, while those who do must be acquitted and go free. This would be introducing a new element into criminal law. Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?

"So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit. this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances."

It seems to be clear from the authorities that defendant's belief was not sufficient justification or excuse to

exonerate him.   The verdict is amply supported by the evidence and there was no harmful errors of procedure. The judgment should, therefore, 'in my opinion, be affirmed.