PER CURIAM.
The appellant was indicted for, and convicted of, manslaughter in the death of her seven-months-old baby and has appealed to this court from her judgment of conviction and sentence entered by the Circuit Court for Bay County.
The sole question presented for our determination in this appeal is whether the State failed to prove a prima facie case of manslaughter through culpable negligence in her baby’s death.
“Manslaughter” is thus defined in Sec. 782.07, Florida Statutes, F.S.A.: “The killing of a human being by the act, procurement or culpable negligence of another, in cases where such killing shall not be justifiable or excusable homicide nor murder, according to the provisions of this chapter, shall be deemed manslaughter and shall constitute a felony of the second degree. . . .”
The indictment charged that the appellant killed the baby “by failing to properly nourish, feed and by unlawfully depriving” the baby “of necessary food. . . .”
*408 The evidence at the appellant’s trial was substantially as follows:
The State presented the testimony of physicians who had treated the baby prior to its death. A physician in the County Health Department saw the baby on September 3, 1969, when it weighed seven pounds and five ounces. The defendant, Mrs. Theus, had taken the baby to the county health offices at the urging of a public health nurse. The said physician examined the baby and noted its thinness. The baby seemed underfed and somewhat irritable, but not otherwise suffering from any physical defect. He advised the defendant to feed the baby some solid food along with its formula and asked that they return in a week.
The defendant with the baby returned to see the said physician the following week on September 10, 1969. The physician stated that, except for a weight gain of about 10 ounces (the baby weighing about seven pounds, 15 ounces), the baby’s condition remained unchanged, and the physician performed tests to determine the baby’s rate of food absorption and the possibility of mental retardation, but the results of both tests were normal. He told the defendant to continue the earlier feeding program and to return with the baby in a week.
The defendant, however, did not return with the baby to the said physician until nearly five weeks later, on October 15, 1969. The said physician considered the baby’s condition the same at this time as on the preceding visit, the baby weighing 9 pounds, seven ounces. The physician stated that the child looked thinner, that its joints were visible, and there was decreased fat between the thigh and buttocks and the skin and bones, but he did not find any illness or ailment that he considered damaging to the child’s growth. At this visit the defendant said that she was feeding as instructed.
The defendant’s fourth visit to the physician was on October 29, 1969, when the child weighed ten pounds, four ounces. The physician stated that he heard a slight heart murmur which he had detected on the initial two visits. He stated that he did not think that the baby suffered from a heart condition, but thought that the murmur was caused by the thinness of the baby’s chest walls and its anemia. The physician stated that he had no explanation for the baby’s failure to gain weight at this time if it had been fed as he had instructed.
On November 26, 1969, the said physician saw the defendant and her baby for the last time. The baby was found to be in the same physical condition, weighing ten pounds, eleven ounces. At this time the physician expressed the belief that the baby was not being fed, and he again instructed the defendant on the subject, telling her that she might be overfeeding the baby with formula but neglecting fruit and cereal. After this fifth visit, the defendant was referred to a pediatrician at a local free clinic.
The defendant saw the pediatrician for the first time on January 12, 1970, when the baby weighed ten pounds, seven ounces. The pediatrician stated that the defendant’s complaint was that the baby was not growing properly or gaining weight. Tests were run and the results proved normal in many areas, including blood count, urine, tuberculosis, chest, heart, kidney, and thyroid. The pediatrician stated that the baby’s only observable deficiency was it was thin and poorly nourished and that its subcutaneous fat had decreased. He found no abnormality that would cause a failure to gain weight or absorb food as long as the baby had been sufficiently fed. The pediatrician discussed feeding with the defendant, encouraged her to give the baby more formula, and asked her to return in two weeks.
The defendant’s second visit to the pediatrician occurred on January 26, 1970, when her baby weighed eleven pounds, nine ounces, showing a gain of one pound. The pediatrician was “well pleased” and did not *409 prescribe any medicine because he felt such was unnecessary.
The third and final visit to the pediatrician was on February 9, 1970. The baby had lost weight, weighing only eleven pounds, two ounces at that time. The pediatrician stated that nothing appeared wrong except for a general state of under-nourishment. The baby’s ribs showed, its subcutaneous fat had decreased, and it could not sit up. The pediatrician testified that he never suggested that the baby be hospitalized, but he asked the defendant to return in two weeks, but she did not do so, and the baby died on March 19, 1970.
A third physician, a pathologist, performed an autopsy on the baby, which then weighed nine pounds, seven and a half ounces. His conclusion from the autopsy was that bronchopneumonia was the primary cause of death, with malnutrition as another significant finding; and that the autopsy revealed no complications of the baby’s organs and all appeared normal.
Witnesses for the defense were two daughters of the defendant, a neighbor, and the defendant herself.
Her 16-year-old married daughter, who had been living with the defendant until a month before the baby died, testified that she had observed the defendant trying to feed the baby solid food, both with a spoon and through a bottle, but the baby would not eat; and that the baby was fed six or seven times daily.
The defendant’s 15-year-old daughter testified that she saw solid food being given to the baby on about three occasions and that the defendant had taken the baby to the pediatrician (contrary to his testimony) one week prior to its death.
The neighbor mentioned above testified that she had taken the defendant and her baby a couple of times to the pediatrician’s clinic and that the baby looked healthy two days before its death.
The defendant took the stand in her own behalf and testified that, in addition to the baby in question, she had seven children “still living”; that she had tried to feed the baby all it would eat, but it would not eat much; that she had told the doctors (the physician and the pediatrician) that the baby would not eat; that they did not tell her that anything was wrong with her baby other than a lack of feeding; that she did not take the baby to the doctors after February 28, 1970, because they were doing nothing for it.
The State in this case, as well as in other criminal prosecutions, has the burden of proving beyond a reasonable doubt that the defendant committed and is guilty of the crime charged, or the conviction will not stand. After carefully examining the above evidence at the trial in the case at bar, wc have reached the conclusion that the State has not successfully carried that burden.
In her brief filed in this appeal the appellant cites and relies upon two Florida decisions — Bradley v. State, 79 Fla. 651, 84 So. 677 (1920) and Neveils v. State, 145 So.2d 883 (Fla.App.1962).
In Bradley v. State, supra, the Supreme Court of Florida held that a father’s failure to provide his daughter with medical attention after she had been burned did not constitute culpable negligence, the Court saying:
“There is no statute in this state specifically making the failure or refusal of a father to provide medical attention for his child a felony, and the general definition of “manslaughter” contained in the statute does not appear to cover a case of this nature. Neither the allegations of the indictment nor the evidence adduced at the trial show ‘the killing of’ the child 'by the act, procurement or culpable negligence of’ the father. Whatever motive may have prompted the father in failing and refusing to provide medical attention for his severely burned' daughter, such failure and refusal, however reprehensible, does not appear to be within the letter or intent of the statute making ‘the *410 killing of a human being by the act, procurement or culpable negligence of another,’ a felony called manslaughter. It is not claimed that the allegations and proofs show that any ‘act’ or ‘procurement’ of the father caused the death of the child. Nor can it be fairly said that the allegations or proofs show that any ‘culpable negligence’ of the father caused ‘the killing of’ the child. Manifestly the death of the child was caused by the accidental burning in which the father had no part. The attentions of a physician may or may not have prevented the burning from causing the death of the child; but the absence of medical attention did not cause ‘the killing’ of the child, even if the failure or refusal of the father to provide medical attention was ‘culpable negligence’ within the intent of the statute. This case is essentially different from Hampton v. State, 50 Fla. 55, 39 So. 421.”
It will be noted from the above quotation from Bradley that the father failed or refused to provide medical attention for his burned daughter, while in the case at bar the evidence shows that the appellant many times sought such attention, for her baby and appeared to be doing her best to save her child.
In the Neveils case, supra, this court reversed a manslaughter conviction which was based upon the theory that the convicted husband failed to provide medical assistance for his wife who had fallen into a drunken stupor and was lying on the floor beside his bed with bruises on her body and limbs. After several hours the wife was taken to the hospital, where she died. One doctor was of the opinion that her death was due to alcoholism while another doctor was of the opinion that the cause of death was physical beating and pneumonia. We reversed the conviction, saying:
“We agree that the evidence purely circumstantial in nature does not meet the test. While there is a strong suspicion the defendant was actually responsible for the condition of his wife, the proof is not inconsistent wtih every reasonable hypothesis of his innocence.
“We are therefore squarely confronted with the proposition of whether or not the appellant was guilty of culpable negligence for failure to aid or otherwise be concerned with the safety of his wife during the intervening approximately four-hour period when he first discovered her lying on the floor and medical attention was received. We think not. In the first place, there is no proof that death would not have followed had she promptly received treatment earlier in the day when first discovered by the defendant nor is there any proof to the contrary.”
The same reasoning, we think, applies in the case at bar.
The rule stated in the first paragraph quoted above from the Neveils case lies at the heart of the case at bar — the circumstantial evidence rule as applied in criminal cases. This established rule was thus stated by the Supreme Court of Florida in Lyons v. State, 47 So.2d 541 (Fla.1950):
“We have held that in order to warrant a conviction upon circumstantial evidence the proof must not only be consistent with the guilt of the accused but must also be inconsistent with any other hypothesis and must be of a conclusive character, pointing directly and unerringly to the accused’s guilt beyond a reasonable doubt, and mere suspicion, probabilities or suppositions are insufficient. Ingram v. State, 144 Fla. 714, 198 So. 464.”
Applying the just-quoted rule to the case at bar, we hold that the evidence at the trial is basically circumstantial as to the appellant’s guilt, but we think that such evidence is not “inconsistent with any other hypothesis” and is not “of a conclusive character, pointing directly and unerringly to the accused’s guilt beyond a reasonable doubt. . . .’’Asa matter of fact, we think that the trial evidence is susceptible of a hypothesis that one or more of the medical experts were negligent *411 in not diagnosing the baby’s illness correctly and prescribing a more effective healing procedure, and in not hospitalizing the baby. In any event, the evidence did not point directly and unerringly to the appellant’s guilt beyond a reasonable doubt.
For the foregoing reasons the judgment appealed from herein must be, and it is, reversed and the cause is remanded with directions to release the appellant from custody.
Reversed and remanded with directions.
CARROLL, DONALD K., Acting C. J., and RAWLS and WIGGINTON, JJ., concur.