748 So.2d 963 (1999)
Etirza EVERSLEY, Petitioner,
v.
STATE of Florida, Respondent.
No. 92,624.
Supreme Court of Florida.
September 23, 1999.
*964 James Marion Moorman, Public Defender, and Paul C. Helm, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for petitioner.
Robert A. Butterworth, Attorney General, Robert J. Krauss, Senior Assistant Attorney General, and Erica M. Raffel, Assistant Attorney General, Tampa, Florida, for respondent.
HARDING, C.J.
We have for review State v. Eversley, 706 So.2d 1363 (Fla. 2d DCA 1998), which expressly and directly conflicts with the opinion in Bradley v. State, 79 Fla. 651, 84 So. 677 (1920). We have jurisdiction pursuant to article V, section 3(b)(3) of the Florida Constitution.
Etirza Eversley was charged with and convicted of manslaughter and felony child abuse due to the death of her infant son, Isaiah. Pursuant to Eversley's motion for judgment of acquittal, the trial court overturned the jury's verdict of manslaughter and reduced the felony child abuse conviction to a misdemeanor. The relevant facts, as stated by the district court, are as follows:
Baby Isaiah was two months old when his mother retrieved him from Carey Barron, the woman to whom she had given him immediately following his birth. Eversley had originally given Isaiah away because she had to work and could not care for him. As evidence of her relinquished custody, Eversley had entered into a written agreement stating that Ms. Barron would be caring for Isaiah. On Sunday, February 4, 1996, Eversley decided to care for Isaiah and went to Ms. Barron's home to retrieve the baby. The evidence regarding whether Isaiah showed signs of ill health at that time is conflicting. Eversley told a police officer that when she picked up Isaiah, Ms. Barron told her he was sick. Ms. Barron, however, testified that he was not sick on Sunday. And, Eversley's aunt, who saw the child around 4:00 p.m. on Sunday, said he was not sick at that time.
Isaiah was clearly exhibiting signs of being ill the next morning. According to Officer James Parry of the Tampa Police Department, Eversley took Isaiah to a nearby clinic to obtain some formula and while there a nurse told Eversley to take Isaiah to the hospital. However, a clerk at the clinic testified that Eversley asked to have a staff member examine Isaiah. A nurse was called and she observed Isaiah and determined that he was having difficulty breathing. Isaiah was breathing in a labored, raspy fashion and "grunting" for breath. The nurse summoned a doctor to further examine Isaiah. Both the nurse and a doctor repeatedly advised Eversley that she must take Isaiah to the emergency room. The nurse specifically told Eversley that the clinic did not have the equipment to verify whether Isaiah had pneumonia and that she must take him directly to the hospital. Both the doctor and the nurse stressed more than once *965 that Isaiah's condition required immediate medical assistance.
In response to their directions, Eversley left the clinic and took Isaiah to the St. Joseph's Hospital emergency room. Upon entering, Eversley noticed there were two or three patients in line ahead of her. Eversley immediately became impatient and left the hospital without attempting to obtain medical aid for Isaiah.
Around midnight, Eversley attempted to feed Isaiah. He was still having difficulty breathing. Isaiah had exhibited similar breathing difficulty during a prior feeding earlier that evening. Nevertheless, Eversley lay down on her bed with Isaiah and went to sleep. At a few minutes before 3:00 a.m., Eversley's brother came home and she awoke. At that point Eversley noticed Isaiah was not breathing and called her aunt, who directed Eversley to call 911 for emergency assistance.
At approximately 3:05 a.m. on February 6, 1996, the paramedics arrived at Eversley's home. They found Isaiah stiff, cold, without a pulse and with fixed, dilated pupils. He seemed to have been dead for quite some time.
At trial, causation was the pivotal issue. Eversley argued that pneumonia, not her actions, caused Isaiah's death. Following a jury trial and conviction, Eversley again raised the issue of causation. Conflicting testimony over the strain of pneumonia Isaiah had contracted was cited to support statistics regarding the likelihood that a child will die as a result of having pneumonia.
Relying on Bradley v. State, 79 Fla. 651, 84 So. 677 (1920), the trial court found that a parent's failure to provide medical care for a child suffering from an injury or illness is not the legal cause of the child's death; therefore, a charge of manslaughter would not lie in such a case.
Eversley, 706 So.2d at 1364-65. The district court reversed the trial court and reinstated the convictions for manslaughter and felony child abuse. The district court concluded that the holding in Bradley a 1920 caseis no longer applicable today. The district court reasoned that this State's view on the criminality of child abuse has changed since the first part of this century. See also Hermanson v. State, 570 So.2d 322, 327 n. 3 (Fla. 2d DCA 1990) ("Because of changes in our child abuse statutes since Bradley was decided, we think, under proper circumstances, a prosecution for manslaughter will lie."), quashed on other grounds, 604 So.2d 775 (Fla.1992); Nozza v. State, 288 So.2d 560, 562-63 (Fla. 3d DCA 1974) ("[Bradley was] decided prior to Section 828.04, Fla.Stat., F.S.A., which makes it a misdemeanor to wilfully deny treatment to a child."). But see Herman v. State, 472 So.2d 770, 771 (Fla. 5th DCA 1985) ("[T]he appellant could not be found guilty of manslaughter in the instant case if he simply failed to summon proper medical assistance for the victim...."); Neveils v. State, 145 So.2d 883, 884 (Fla. 1st DCA 1962) (holding that appellant who failed to provide medical care to his wife was not guilty of manslaughter).
In Bradley, a father was charged with manslaughter for the death of his minor daughter. The girl suffered from epilepsy, and during an epileptic attack, she fell unconscious into a fire and was severely burned. For approximately a month, the father failed to provide the necessary medical care. The girl was subsequently sent to the Florida Hospital for the Insane, where she eventually died. After being convicted of manslaughter, the defendant filed a writ of error with this Court. This Court reversed the conviction.

Manslaughter
The manslaughter statute in effect at the time of the crime in Bradley contained the same elements as the manslaughter statute in effect at the time of the crime in *966 this case. See § 3209, Fla.Stat. (1906);[1] § 782.07, Fla.Stat. (1995).[2] In both instances, manslaughter could be established based on evidence that the defendant (1) caused the death of another person, (2) by culpable negligence, and (3) without justification. The Bradley decision addressed both the causation element and the culpable negligence element.

I. Causation
The Court in Bradley held that the father's failure to provide care was not the cause of his child's death:
It is not claimed that the allegations and proofs show that any "act" or "procurement" of the father caused the death of the child. Nor can it be fairly said that the allegations or proofs show that any "culpable negligence" of the father caused "the killing of" the child. Manifestly the death of the child was caused by the accidental burning in which the father had no part. The attentions of a physician may or may not have prevented the burning from causing the death of the child; but the absence of medical attention did not cause "the killing" of the child, even if the failure or refusal of the father to provide medical attention was "culpable negligence'" within the intent of the statute.
79 Fla. at 655-56, 84 So. at 679. This reasoning is rather ambiguous, especially when considered in conjunction with the dissenting and concurring opinions.[3]
In this case, the district court found that Eversley's conduct was the cause of her child's death. In reaching this conclusion, the district court relied on the "material contributing factor" test, also called the "substantial factor" test. The district court reasoned that "[m]odern manslaughter cases have broadly construed the causation requirement." Eversley, 706 So.2d at 1365. The district court stated that "instead of using the old `but for' test for causation, causation may be satisfied when a defendant's action is a material contributing factor in the victim's death." Id. Eversley argues that the proper test for determining cause-in-fact causation in this case was the "but for" test. We agree.
Causation consists of two distinct subelements. As legal scholars have recognized, before a defendant can be convicted of a crime that includes an element of causation, the State must prove beyond a reasonable doubt that the defendant's conduct was (1) the "cause in fact" and (2) the *967 "legal cause" (often called "proximate cause") of the relevant harm. See, e.g., 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 3.12, at 390, 392 (2d ed.1986). See also United States v. Pitt-Des Moines, Inc., 970 F.Supp. 1359, 1364 (N.D.Ill.1997), aff'd, 168 F.3d 976 (7th Cir.1999).
In order to establish that a defendant's conduct was the "cause in fact" of a particular harm, the State usually must demonstrate that "but for" the defendant's conduct, the harm would not have occurred. See LaFave & Scott, supra, at 390, 392-94; Pitt-Des Moines, 970 F.Supp. at 1364; Hodges v. State, 661 So.2d 107, 110 (Fla. 3d DCA 1995) (quoting Velazquez v. State, 561 So.2d 347, 350 (Fla. 3d DCA 1990)). A defendant can rebut this showing by demonstrating that the harm would have occurred in any event, regardless of the defendant's conduct. See Pitt-Des Moines, 970 F.Supp. at 1364. In those rare circumstances where "two causes, each alone sufficient to bring about the harmful result, operate together to cause it," the "but for" test becomes impossible to prove. LaFave & Scott, supra, at 394.[4]See also Hodges, 661 So.2d at 110 n. 3; Velazquez, 561 So.2d at 351. In these circumstances, the State may prove "cause-in-fact" causation by demonstrating that the defendant's conduct was a "substantial factor" in bringing about the harm. See LaFave & Scott at 394-95; Velazquez, 561 So.2d at 351.
In addition to establishing "cause-infact" causation, the State must also demonstrate that the defendant's conduct was the "proximate cause" of the particular harm. Florida courts have considered two basic questions in determining proximate cause: (1) whether the prohibited result of the defendant's conduct is beyond the scope of any fair assessment of the danger created by the defendant's conduct and (2) whether it would be otherwise unjust, based on fairness and policy considerations, to hold the defendant criminally responsible for the prohibited result. See Hodges, 661 So.2d at 110; Velazquez, 561 So.2d at 351.
The issue before us in this case is which test was proper to determine "cause-in-fact" causation. Based on the facts of this case, we conclude that the traditional "but for" test is the appropriate test. Although deceiving at first glance, this is not a case where two causes, each alone sufficient to bring about the harmful result, operated together to cause the result. Therefore, the "substantial factor" test does not apply. Under the "but for" test, the State was required to show that "but for" Eversley's failure to provide medical care, the child would not have died. Eversley could rebut the State's argument by establishing that the death would have occurred in any event, regardless of her failure to provide medical care.
At trial, Eversley's medical expert testified that the mortality rate for infants with a similar strain of pneumonia is 25%.[5] In contrast, the State's expert testified that the mortality rate is 1% with antibiotic treatment.
We do not agree with Chief Justice Browne that medical testimony cannot be the basis for establishing causation. See *968 Bradley, 79 Fla. at 656, 84 So. at 679 (Browne, C.J., concurring) ("Has the practice of medicine become an exact science, so that, after death, human testimony can establish beyond a reasonable doubt that if a physician had been called the child would not have died?"). Clearly, medical science has progressed beyond the days of Bradley. Today, it is common to uphold convictions on the basis of medical testimony advancing reasonable theories of causation when such testimony has been supplemented by other evidence supporting the causal relation at issue. See Brate v. State, 469 So.2d 790, 794 (Fla. 2d DCA 1985).
In Delap v. State, 440 So.2d 1242, 1253 (Fla.1983), this Court stated the following regarding medical testimony:
In a criminal case expert medical opinion as to cause of death does not need to be stated with reasonable medical certainty. Such testimony is competent if the expert can show that, in his opinion, the occurrence could cause death or that the occurrence might have or probably did cause death.
... Even though the state may be required to prove the cause of death beyond a reasonable doubt, this does not mean that every link in the chain of evidence must be so proved. To be admissible, a medical expert's opinion as to the cause of an injury or death does not have to be expressed in terms of a reasonable medical certainty. Such evidence is admissible, but the weight to be given it is a matter to be determined by the jury.
Where conflicts exist in testimony, the jury has the prerogative to resolve those conflicts in favor of the State. See Riechmann v. State, 581 So.2d 133, 140 (Fla.1991). Therefore, we find that there is competent, substantial evidence in the record to support the jury's finding as to the causation element.

II. Culpable Negligence
Bradley also held that the failure to provide medical care does not rise to the level of culpable negligence required for the manslaughter statute:
There is no statute in this state specifically making the failure or refusal of a father to provide medical attention for his child a felony, and the general definition of "manslaughter" contained in the statute does not appear to cover a case of this nature. Neither the allegations of the indictment nor the evidence adduced at the trial show "the killing of" the child "by the act, procurement or culpable negligence of" the father. Whatever motive may have prompted the father in failing and refusing to provide medical attention for his severely burned daughter, such failure and refusal, however reprehensible, does not appear to be within the letter or intent of the statute making "the killing of a human being by the act, procurement or culpable negligence of another," a felony called manslaughter.
79 Fla. at 655, 84 So. at 680 (emphasis added). The emphasized language is the key to deciding this issue. As stated earlier, the manslaughter statute in effect at the time of the crime in this case was the same as the manslaughter statute in effect at the time of Bradley. Thus, the reasoning of Bradley controls our decision in this case. We therefore hold that under the statute in effect at the time of the crime in this case, section 782.07, Florida Statutes (1995), the failure to provide medical care does not satisfy the culpable negligence element of manslaughter.
Effective October 1, 1996, the legislature amended the manslaughter statute. Under the amended statute, the legislature specifically included felony child abuse within the purview of manslaughter:
(1) The killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification according to the provisions of chapter 776 and in cases in which such *969 killing shall not be excusable homicide or murder, according to the provisions of this chapter, is manslaughter, a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(2) A person who causes the death of any elderly person or disabled adult by culpable negligence under s. 825.102(3) commits aggravated manslaughter of an elderly person or disabled adult, a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(3) A person who causes the death of any person under the age of 18 by culpable negligence under s. 827.03(3) commits aggravated manslaughter of a child, a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
§ 782.07, Fla.Stat. (1997) (emphasis added). That same year, the legislature also amended the child abuse statute:
(1) "Child abuse" means:
(a) Intentional infliction of physical or mental injury upon a child;
(b) An intentional act that could reasonably be expected to result in physical or mental injury to a child; or
(c) Active encouragement of any person to commit an act that results or could reasonably be expected to result in physical or mental injury to a child. A person who knowingly or willfully abuses a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(2) "Aggravated child abuse" occurs when a person:
(a) Commits aggravated battery on a child;
(b) Willfully tortures, maliciously punishes, or willfully and unlawfully cages a child; or
(c) Knowingly or willfully abuses a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child. A person who commits aggravated child abuse commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(3)(a) "Neglect of a child" means:
1. A caregiver's failure or omission to provide a child with the care, supervision, and services necessary to maintain the child's physical and mental health, including, but not limited to, food, nutrition, clothing, shelter, supervision, medicine, and medical services that a prudent person would consider essential for the well-being of the child; or
2. A caregiver's failure to make a reasonable effort to protect a child from abuse, neglect, or exploitation by another person.
Neglect of a child may be based on repeated conduct or on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or mental injury, or a substantial risk of death, to a child.
(b) A person who willfully or by culpable negligence neglects a child and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(c) A person who willfully or by culpable negligence neglects a child without causing great bodily harm, permanent disability, or permanent disfigurement to the child commits a felony of the third degree, punishable as provided in s. 775,082, s. 775.083, or s. 775.084.
§ 827.03, Fla.Stat. (1997) (emphasis added). By making a specific reference to the child abuse statute, it is clear that the Legislature now intends to include the failure to provide medical care within the definition of manslaughter. Had the amended statutes been in effect at the time of the alleged crime in this case, Eversley's conduct would have been punishable as manslaughter. However, the *970 alleged crime in this case took place on February 5, 1996prior to the effective date of the amendments. Therefore, Bradley controls, and the trial court was correct in granting the motion for judgment of acquittal as to the manslaughter charge.

Child Abuse
We do agree with the district court regarding the felony child abuse charge. The child abuse statute in effect at the time of this crime clearly intends to include the failure to provide medical care within the definition of child abuse:
(1) Whoever, willfully or by culpable negligence, deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment, or who, knowingly or by culpable negligence, inflicts or permits the infliction of physical or mental injury to the child, and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to such child, shall be guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(2) Whoever, willfully or by culpable negligence, deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment, or who, knowingly or by culpable negligence, inflicts or permits the infliction of physical or mental injury to the child, shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.
§ 827.04(1)-(2), Fla.Stat. (1995). See generally Nicholson v. State, 600 So.2d 1101, 1104 (Fla.1992) ("Thus, a willful `omission, or neglect whereby unnecessary or unjustifiable pain or suffering is caused' constitutes aggravated child abuse under section 827.03(1).") (footnote omitted); Leet v. State, 595 So.2d 959, 964 (Fla. 2d DCA 1991) ("Section 827.04 applies to acts of omission as well as acts of commission."). The only difference between felony child abuse and misdemeanor child abuse is the element of "great bodily harm." At a hearing on Eversley's renewed motion for judgment of acquittal, the trial judge declared that he did not believe that the "great bodily harm" element included death. The trial judge stated, "There was no evidence whatsoever that Isaiah was caused any great bodily harm from lack of treatment."
We find that the trial court erred in reducing the felony child abuse conviction. The fact that the baby died is adequate proof of the "great bodily harm" element.
Accordingly, we quash that part of the district court's decision that reinstated the manslaughter conviction. We approve that part of the decision that reinstated the felony child abuse conviction.
It is so ordered.
WELLS and ANSTEAD, JJ., and OVERTON, Senior Justice, concur.
SHAW and PARIENTE, JJ., concur in result only.
NOTES
[1] Section 3209, Florida Statutes (1906), states:

The killing of a human being by the act, procurement or culpable negligence of another, in cases where such killing shall not be justifiable or excusable homicide nor murder, according to the provisions of this article, shall be deemed manslaughter, and shall be punished by imprisonment in the State prison not exceeding twenty years, or imprisonment in the county jail not exceeding one year, or by fine not exceeding five thousand dollars.
[2] Section 782.07, Florida Statutes (1995), states:

The killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable homicide or murder, according to the provisions of this chapter, shall be deemed manslaughter and shall constitute a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
[3] In his dissent, Justice West stated, "At the trial the physicians who treated [the child] testified that her death resulted from the burn, and that in their opinion if she had received medical attention promptly after being burned she would have recovered." Bradley v. State, 79 Fla. 651, 658, 84 So. 677, 680 (1920) (West, J., dissenting). In a concurring opinion, Chief Justice Browne stated that medicine was not an exact science and that the State "was not capable of [proving] that if the child had had medical attention it would have recovered." Id. at 656-57, 84 So. 677 (Browne, C.J., concurring). This begs the questionwas the majority holding that the State failed to prove causation in this case or that the State could never prove causation in this case or any other case with similar facts?
[4] LaFave and Scott offer the following example as a case where the "substantial factor" test is properly applied:

In the criminal law too the situation sometimes arises where two causes, each alone sufficient to bring about the harmful result, operate together to cause it. Thus A stabs B, inflicting a fatal wound; while at the same moment X, acting independently, shoots B in the head with a gun, also inflicting such a wound; and B dies from the combined effects of the two wounds. It is held that A has caused B's death....
LaFave & Scott, supra, at 394.
[5] The State's expert based her mortality rate on Streptococcal pneumonia, without specifying a particular type. In contrast, the defense expert based his mortality rate on Group B Streptococcal pneumonia, a particularly dangerous strain of pneumonia. The medical examiner testified that Isaiah died from Group B Streptococcal pneumonia.