UNITED STATES of America, Plaintiff-Appellee,

v.

Kealoha Crash SPINNEY, Defendant-Appellant.

No. 85–1248.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 25, 1986.

Decided July 29, 1986.

Mark J. Bennett, Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff-appellee.

Benjamin B. Cassiday, III, Asst. Fed. Pub. Defender, Honolulu, Hawaii, for defendant-appellant.

Before FERGUSON, CANBY, and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

A jury found defendant, Kealoha Crash Spinney, guilty on two counts of conspiracy to commit simple assault, a misdemeanor. The district court sentenced defendant to two consecutive 90–day sentences. In addition, the court imposed a fine of $15,000 and restitution totaling $20,337.59. De-

fendant appeals from the district court's sentence. We vacate and remand for resentencing.

## I

In January 1985, defendant helped Gerry Peters move from the home of James and Russell Scott. Gerry Peters shared rent with the Scotts in a house in Kailua View Estates. She was James' girlfriend, although she maintained separate quarters in the house. When Gerry could no longer afford the rent, James suggested that if she would sleep with him the rent would not be a problem. They argued over the rent, and when Gerry refused James' proposition, he beat her. Gerry then decided to move out of the Scotts' residence.

Gerry knew defendant's girlfriend, Lynette, who offered to help Gerry move. Defendant became involved in the move because he owned a truck and because Gerry was afraid to go back into the Scotts' house alone. On the day Gerry moved, defendant and another man, Butch Fischer, accompanied her to the Scotts' house. When they arrived, James was asleep and Russell let them in the house. The move occurred without incident, except that as the defendant left the house, he told Russell that if James ever beat Gerry again there would be "trouble."

The next day, January 27, 1985, defendant related Gerry's story to Wayne Kaiwi as the two were fishing in the waters off Kona. Defendant was concerned that because Gerry had moved in with Lynette that James might seek revenge on both of them. Kaiwi and defendant decided that James needed to be taught a lesson and that they should "slap him around a little." They decided, however, that because James was a big man, about six feet five inches, they needed someone else to help them. Kaiwi and defendant returned to shore and went to a party where they enlisted the aid of James Muller. After hearing what James Scott had done to Gerry, Muller agreed to help.

Because the Scotts' were reputed to be marijuana dealers, defendant decided that they should take weapons. The group went to the *Medusa*, a charter boat captained by the defendant. Defendant removed and loaded a .45 and a shotgun, which he gave to Muller and Kaiwi. They then went to defendant's house to get a .22 rifle which defendant carried himself. At approximately 6:30 P.M., the three left for the Scotts' house. Kaiwi and Muller drove a rental car which was in defendant's care. Defendant drove his truck.

When the trio arrived at the Scotts, an argument ensued, and the remaining facts were disputed at trial. According to the government's witness, Kaiwi, who plea bargained for a 25–year sentence, defendant had Kaiwi and Muller approach the house, while defendant waited in his truck. The plan was to kidnap James, take him out in the boat, "scare him to death," and then bring him back alive. James and Russell emerged from the house as Muller and Kaiwi approached. There was a scuffle when Russell got mad and Muller fired the .45 which hit Russell's nose. Kaiwi pulled the shotgun and ordered both of the Scotts into the car. During this time, the defendant left the Scotts' house in his truck. Kaiwi and Muller drove to where the *Medusa* was moored and waited for defendant. When defendant did not appear, they went to look for him, eventually meeting with him on a nearby road. According to Kaiwi, defendant told them to follow him back to the harbor where they would load the Scotts on the *Medusa*.

When the group arrived at the harbor, there were too many people around so they decided that Kaiwi and Muller should take the Scotts to a secluded pier and defendant would meet them there with the *Medusa*. Kaiwi then testified that the Scotts were loaded onboard and taken to a point ten to twelve miles off shore. He stated that defendant wanted to kill the Scotts, but the three argued as to who should perform the execution. Finally, Muller took the .45, ordered the Scotts on deck, and fired two rounds into James' stomach, which caused him to fall overboard. Muller then began to fire at Russell who jumped overboard.

Russell was hit by two rounds, one in the scrotum. James attempted to climb back aboard the *Medusa* whereupon Muller threatened to shoot him in the head. James fell into the water and the *Medusa* left the Scott brothers there to die. Russell held James above the water for several hours until his brother died. He then proceeded to swim towards shore; a fishing boat rescued Russell several hours later.

Defendant testified to a different version of this grisly tale. He claimed that when the shot was fired outside the Scotts' house, he got scared and fled the scene. Defendant stated that he went back to his house for awhile, but then left again because he knew Muller and Kaiwi would look for him there. When Muller and Kaiwi intercepted him on the road, defendant testified that they threatened to shoot him if he did not continue to cooperate. Defendant maintained that he then suggested the alternative pier in order to buy time in the hope that this would "cool out" the situation. When Muller and Kaiwi insisted on shooting the Scotts, defendant stated that he went down below in the cabin and only reemerged when he heard a "whole lot of shots."

All three of the perpetrators were charged with a ten count indictment that included conspiracy to murder, felony murder, kidnaping, and illegal use of firearms. Kaiwi plea bargained for a 25–year sentence. Muller was found guilty of felony murder, kidnaping, and illegal use of firearms. He received a life sentence. The jury found defendant guilty on two counts of conspiracy to commit simple assault, apparently believing that defendant wanted to withdraw from the conspiracy and that events simply "got out of hand." He received two 90–day sentences, of which he has served all but eight days. The district judge also imposed fines of $15,000 and restitution of $20,337.59. On appeal, defendant argues that he should have received only one 90–day sentence because there was only one conspiracy and that the fines and restitution were improper because he was not responsible for the harm done to the Scotts.

II

■ Judge Edward Leavy presided over defendant's trial, but returned to his home district in Oregon before sentencing. Judge Martin Pence, District of Hawaii, received the jury's verdict and sentenced defendant. Defendant now argues that his sentence should be vacated and that Judge Leavy should be allowed to resentence him. When the sentencing judge has not presided over trial, we review his decision to impose sentence for an abuse of discretion. *United States v. Larios*, 640 F.2d 938, 942–43 (9th Cir.1981).

Under Fed.R.Crim.P. 25(b), if the judge before whom the defendant was tried is absent, any judge regularly sitting in the district may sentence the defendant. If that judge feels he cannot sentence the defendant properly, then he may grant a new trial at his discretion. *Id.* We have held that there is no abuse of discretion when the sentencing judge is familiar with the case and uses informed discretion in passing sentence. *United States v. Rosales-Lopez*, 617 F.2d 1349, 1357 (9th Cir. 1980), *aff'd*, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). *See also Larios*, 640 F.2d at 942–43; *United States v. Ortiz*, 603 F.2d 76, 81 (9th Cir.1979), *cert. denied*, 444 U.S. 1020, 100 S.Ct. 678, 62 L.Ed.2d 652 (1980).

■ Judge Pence demonstrated his familiarity with this case in several ways. He received the jury's verdict; he sentenced Muller; he read the presentence report prepared for all three defendants; he read the sentencing memorandum prepared by the government and the defendant's response, which included most of the legal arguments made to this court. Judge Pence did not read the trial transcript, but this step is not required in every case. "Becoming adequately familiar does not always require the reading of a transcript, although a transcript will often be helpful, and sometimes essential." *Larios*, 640 F.2d at 943. In this case, a reading of the transcript was not essential because de-

fendant was convicted only for the conspiracy, so there was no need to evaluate the extent and degree of his culpability relative to the other defendants. *Id.* Judge Pence showed he was familiar with the case by his conduct of the sentencing hearing. He did not make the factual errors that led the panel in *Larios* to conclude that the sentencing judge abused his discretion.

The record also demonstrates that defendant's sentence was the result of Judge Pence's informed discretion. The two misdemeanors committed by defendant carried a combined maximum fine of $500,000. Yet, Judge Pence fined defendant $15,000. He considered defendant's income and financial responsibilities in determining the appropriate fine. *See Rosales-Lopez,* 617 F.2d at 1357. We therefore find that Judge Pence did not abuse his discretion in sentencing defendant.

### III

■ The jury found defendant guilty on two counts of conspiracy: one to commit simple assault on James Scott and another to commit simple assault on Russell Scott. Defendant argues that only one conspiracy existed to assault the Scott brothers and therefore Judge Pence erred in passing separate sentences. The jury's finding that two conspiracies existed is reviewed under the sufficiency of evidence standard. *United States v. Peacock,* 761 F.2d 1313, 1316 (9th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985); *United States v. Bloch,* 696 F.2d 1213, 1215 (9th Cir.1982). The essential inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

■ The gist of the crime of conspiracy is an agreement to commit one or more unlawful acts. *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942) (only one conspiracy existed when agreement to distribute illegal dis-

tilled spirits violated several different provisions of the Internal Revenue Code; government had charged a separate conspiracy for each violation); *Bloch,* 696 F.2d at 1215. "If there exists but a single agreement to achieve the objectives of the conspirators, there exists but a single conspiracy." *Peacock,* 761 F.2d at 1319. "The Government may not divide a single agreement into multiple ones, and hence several conspiracies, merely because the agreement contemplates the violation of multiple penal statutes." *Id.*

■ After reviewing the record, we believe there is insufficient evidence for a rational trier of fact to have concluded that there were separate conspiracies against James and Russell Scott. Both the prosecution and the defense requested the district judge to sentence for a single conspiracy, and we fail to see, based on the proof submitted at trial, how there could have been more than one conspiracy to commit simple assault.

In resentencing, the district judge can impose a sentence not to exceed 90 days for one count of conspiracy, along with a single fine for the same count. Restitution for all victims of the single conspiracy can also be ordered. *See United States v. Hagler,* 709 F.2d 578, 579 (9th Cir.), *cert. denied,* 464 U.S. 917, 104 S.Ct. 282, 78 L.Ed.2d 260 (1983).

### IV

The jury found defendant guilty of two counts of conspiracy to commit simple assault, a misdemeanor. Under 18 U.S.C. §§ 371 and 113(e) this crime carries a maximum penalty of a 90-day sentence and a $300 fine. In 1984, however, Congress enacted the Criminal Fine Enforcement Act. Title 18 U.S.C. section 3623(a)(4) provides that a "misdemeanor resulting in death" may be punished by a fine of up to $250,-000. This is a case of first impression interpreting the quoted language in section 3623(a)(4). Judge Pence relied on this section to fine the defendant $10,000 for the conspiracy against James and $5,000 for

the conspiracy against Russell. The propriety of these fines poses a question of law which we review de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.1984) (en banc), *cert. denied,* — U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1985).

Defendant argues that because he was acquitted for murder and all other substantive offenses relating to the death of James Scott, he cannot be held to have committed a "misdemeanor resulting in death." He further argues that to impose a fine on him for the death of James would invade the province of the jury because they found he was not legally culpable for any substantive crime. He frames his argument in terms of causation: In order to impose a fine under section 3623, the court must find that defendant committed a misdemeanor that "resulted" in death. Defendant argues that the offense he committed, conspiracy to commit simple assault, did not cause the death of James Scott. The actions of Kaiwi and Muller were superseding causes which interrupted any liability that might have been visited upon defendant for James' death. Because the jury acquitted him on the murder charges, defendant concludes that his misdemeanor conspiracy charge cannot be the legal or proximate cause of James' death.

Defendant, however, misconstrues the nature and purpose of the fines assessed against him. He is not being punished for murder, which would be contrary to the jury's decision, but for his participation in a *conspiracy* which led to the death of an individual. In essence, defendant argues that because conspiracy is an inchoate crime, he cannot be held responsible for any of the consequences of the conspiracy

because he was acquitted of the substantive offenses. We rejected the argument that damages cannot stem from the conspiracy itself in *United States v. Gering,* 716 F.2d 615, 624 n. 6 (9th Cir.1983) (citing *United States v. Tiler,* 602 F.2d 30, 33–34 (2d Cir.1979)); *Phillips v. United States,* 679 F.2d 192, 194–96 (9th Cir.1982) (approving of *Tiler* analysis and upholding restitution award in mail fraud case). In *Gering* and *Phillips, supra,* we made clear that restitution may properly be imposed for damages stemming from the operation of a conspiracy.

■ The relevant question is whether the misdemeanor conspiracy to assault James resulted in his death.[1] A basic tenet of criminal law is that the government must prove that the defendant's conduct was the legal or proximate cause of the resulting injury. Causation in criminal law has two requirements: cause in fact and proximate cause. W. LaFave & A. Scott, *Criminal Law* § 35 (1972); C. Torcia, *Wharton's Criminal Law* § 26 (14th ed. 1978); R. Perkins & R. Boyce, *Criminal Law* 774 (3d ed. 1982). Cause in fact is relatively simple in this case. But for the conspiracy, James would not have died in the manner he did. Even if the actions of Kaiwi and Muller were the immediate cause of death, the conspiracy was a substantial factor in causing James' death.

■ Proximate cause, however, is a more difficult question. "[E]ven when cause in fact is established, it must be determined that any variation between the result intended ... and the result actually achieved is not so extraordinary that it would be unfair to hold the defendant responsible for the actual result." W. LaFave & A. Scott, *Criminal Law* § 35 at

1. Congress did not define "misdemeanor resulting in death" in the legislative history to section 3623; however, Congress did note that maximum fine levels for the vast majority of federal laws are "unrealistically low" and "'woefully inadequate to deter criminal behavior.'" H.R. Rep. No. 906, 98th Cong., 2d Sess. 2, *reprinted in* 1984 U.S.Code Cong. & Ad.News 5433, 5434 (quoting H.R.Rep. No. 1396, 96th Cong., 2d Sess. 465 (1980). This legislative history illustrates that Congress did not intend to ascribe a narrow meaning to the phrase "misdemeanor resulting

in death." The defendant in this case participated in criminal activity that warrants more punishment than a $300 fine. Conspiracy involves harms separate from the substantive offense (for example increase in the complexity of crimes attempted, increase in the likelihood of success in the criminal undertaking, and decrease in the likelihood of abandonment) which are contrary to Congress' attempt to deter criminal behavior. Our conclusion today that a conspiracy may be a misdemeanor resulting in death is consistent with the legislative scheme.

246 (1972).[2] The jury found that defendant conspired with Kaiwi and Muller to scare James into thinking they were going to kill him. That was the result intended. To this end, defendant placed a loaded .45 in Muller's hands when he knew Muller was "wasted," i.e., someone who had ingested four tabs of LSD, some marijuana, and the better part of a 12–pack of beer.[3] The crux of this case is whether the actual result achieved by the conspiracy, the shooting of James, was so extraordinary that it would be unfair to hold that defendant participated in a misdemeanor that resulted in death. We think not. The conspiracy gave Muller the opportunity to kill when and where he did. Defendant supplied the idea and all the means for killing James. It was entirely foreseeable that the conspiracy could lead to the harm that eventually befell the Scotts. Under these circumstances, it is not unfair to hold that James' death was the proximate result of the conspiracy, even though defendant was not guilty of any other substantive offense. We therefore find it permissible to impose a fine upon Spinney as a penalty for a misdemeanor resulting in death.

## V.

Title 18 U.S.C. § 3579(b)(2) authorizes a judge to order restitution for a criminal "offense resulting in bodily injury to a victim." Judge Pence relied on this section to order restitution in the amount of $16,499.07 for the medical and other expenses of Russell. Subsection (b)(3) of 18 U.S.C. § 3579 further authorizes restitution for funeral expenses when a criminal

"offense resulting in bodily injury also results in the death of the victim." Judge Pence ordered defendant to pay $3,838.53 in restitution to cover the expenses for James' funeral. As in the case of the fines imposed by Judge Pence, defendant argues that the misdemeanor he committed did not result in the bodily injury of either Russell or James. Whether section 3579 authorizes restitution under the circumstances of this case is a question of law reviewed de novo. *McConney*, 728 F.2d at 1201.

We reject defendant's causation argument for the reasons discussed in the previous section. Additionally, proximate cause is more obvious when the defendant's act must result only in "bodily injury" rather than "death." It is all the more foreseeable that a conspiracy to assault someone could result in bodily injury to the victim. The conspiracy to assault the Scotts as a matter of law and common sense certainly resulted in bodily injury to James and Russell.

"The premise of [section 3579] is that the court in devising just sanctions for adjudicated offenders, should insure that the wrongdoer make goods [sic], to the degree possible, the harm he has caused his victim." S.Rep. No. 532, 97th Cong., 2d Sess. 30, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2515, 2536. Defendant again argues that because he was acquitted of all substantive offenses, he caused no harm to the victims. We have rejected the notion that an inchoate crime such as conspiracy cannot cause harm to the victim:

[W]e are of the view that appellants' argument that no actual damages flow

---

**2.** We reject the government's argument that the *Restatement of Torts* provides a useful guideline for resolving the proximate cause issue in this case. Proximate cause analysis in crimes differs from tort analysis of causation. "The most obvious difference in this regard between the two areas of law, of course, is that in tort law the defendant may be held responsible for harms different than those actually risked by his conduct, while this is generally not the cause [sic] in criminal law." W. LaFave & A. Scott, *Criminal Law* § 35 at 251 (1972) (footnotes omitted). Tort causation analysis thus "should be avoided when attention is directed to the boundary lines between proximate cause and remote cause as a problem of criminal law." R.

Perkins & R. Boyce, *Criminal Law* 777 (3d ed. 1982).

**3.** A psychiatric report prepared for Muller's defense claimed that he was in even worse shape on the date of James' death:

Drugs Used:

| Time of Day: 1/27/85 | Substance |
| --- | --- |
| 9–12 am | 36 cans of beer |
| 10:30–11:00 | 4 doses of LSD |
| 12:30– 1:00 | 2 doses of LSD, marijuana |
| 2 pm | 3 quaaludes |
| 5:30 | 2 doses of LSD, 3 lines cocaine |
| 6 pm | 2 doses of LSD |
| 12–5 pm | 36 cans of beer |

from the crime of conspiracy is overly technical.... While it is true "that the agreement is the essential evil at which the crime of conspiracy is directed," ... we believe that restitution may be ordered ... for actual damages *charged in the indictment* to have been caused by the operation of the conspiracy over time....

*Gering,* 716 F.2d at 624 n. 6 (quoting *Tiler,* 602 F.2d at 34 (citation omitted) (emphasis in original)). Moreover, one court of appeals has concluded that in order to establish grounds for restitution under section 3579, "the government need not prove that the defendant was *directly* responsible for the loss." *United States v. Richard,* 738 F.2d 1120, 1123 (10th Cir.1984) (emphasis added). A restitution order is authorized if the defendant created the circumstances under which the harm or loss occurred. *Id.* In this case, defendant initiated and participated in a conspiracy that created the circumstances which led to the injuries of James and Russell.

We have previously upheld a restitution order in a case in which the defendant claimed that an intervening cause insulated him from liability. In *United States v. Keith,* 754 F.2d 1388 (9th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 93, 88 L.Ed.2d 76 (1985), the defendant assaulted the victim with the intent to rape her. The victim sought restitution for lost wages when she left her job after receiving what she interpreted to be a threat from the defendant's mother. *Id.* at 1393. The defendant argued that the threat was an intervening cause that was not related to the assault itself. In effect the defendant in *Keith* was arguing, as defendant does here, that he was not responsible for damages caused by the acts of another. We rejected this argument: "The possible intervening cause discussed by [defendant] is directly related to the assault. He cannot seriously contend that the victim's loss of wages was not a 'result of [the] offense.'" *Id.* The injuries that the Scotts sustained in this case are directly related to the conspiracy to assault them. Defendant should not be absolved of his responsibility to make resti-

tution solely on the grounds that the acts of Muller and Kaiwi were intervening causes. *Cf. United States v. Durham,* 755 F.2d 511, 513 (6th Cir.1985) (restitution proper for one "who suffered injury as a result of the defendant's actions that surrounded the commission of the offense, regardless of whether the actions are elements of the offense charged"). Accordingly, we hold that the district court may order restitution pursuant to sections 3579(b)(2) and (b)(3).

### VI

The sentences imposed by the district court for two separate conspiracies are vacated. The case is remanded to the district court for resentencing for one count of conspiracy to commit simple assault, in accordance with this opinion.

SENTENCES VACATED: REMANDED FOR RESENTENCING.