**UNITED STATES of America, Plaintiff,**

v.

**PITT–Des MOINES, INC., Defendant.**

**No. 96 CR 513.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 10, 1997.

Daniel Francis Gallagher, Querrey & Harrow, Ltd., Chicago, IL, R. Henry Moore, Buchanan Ingersoll Prof. Corp., George Patrick Lynch, Lisle, IL, for Pitt-Des Moines, Inc.

Mark S. Hersh, U.S. Attys. Office, Chicago, IL, for U.S.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

In a Memorandum Opinion and Order issued on June 12, 1997, the court denied various motions filed by Defendant Pitt–Des Moines, Inc. ("PDM") to dismiss the indictment in this case. The court now rules on a number of motions in limine filed by PDM and by Plaintiff United States of America ("government").

### Background

This case stems from a construction accident that killed two ironworkers. The two workers were helping build a United States postal facility in downtown Chicago ("Post Office"). The general contractor in charge of the project had hired PDM to fabricate and erect structural steel members. On November 3, 1993 some of these steel members collapsed, killing two ironworkers. The indictment charges that PDM willfully violated federal safety standards, and that this violation caused the deaths of the two workers, thereby subjecting PDM to criminal liability under the Occupational Safety and Health Act of 1970 ("OSH Act").

Although PDM vigorously opposes the government's motions in limine, PDM does not appear to disagree with any significant aspects of the government's summary of the technical background:

> The government expects that the evidence at trial will show (and will not be disputed) that PDM used the following basic and more-or-less standard procedures for erecting the structural steel on the post office project. First, the connectors (also called the "raising gang") erect the steel members; as cranes lift steel pieces, the connectors put them in place and make connections to hold the pieces together temporarily until more permanent connections can be made. Once a connection is made, the lines holding the steel pieces are released. Next, the bolters (or "bolt-up crew") come through and make sure the proper size bolts are in place; they replace any wrong-sized bolts used by the raising gang and insert and tighten additional bolts. The ironworkers then "plumb-up," or align the structure. Finally, the welders weld the connections to make the structure permanent.
>
> The evidence will also show (and, again, will not be seriously disputed) that the immediate cause of [the collapse of steel members on November 3, 1993] was the failure of a temporary connection between two steel members before it was secured by the bolt-up crew. More specifically, the collapse was triggered by the failure of a connection between a very large horizontal collector beam and a vertical column web ("Collector Beam A–3550" and "Column A–1469," as they are identified in the design drawings). An L-shaped erection angle ("Erection Angle A–1285")—commonly known as a "seat angle" or "seat lug"—was attached to the column web and served as a ledge on which the collector beam rested. The collapse occurred when this erection angle failed, i.e., bent or folded, and the collector beam slid off. [The connection between Collector Beam A–3550 and Column A–1469] was made more than a day before the collapse, and in the interim PDM had erected additional floor beams

and columns, which connected to Collector Beam A–355. Thus, the erection angle failed under the weight of the additional steel, and when it did the collector beam fell and the many steel members connected to the collector beam fell with it.

(Gov't's Mots. in Lim. at 2–3.) This collapse killed two ironworkers.

The government alleges that this collapse would not have occurred if PDM had bolted the collector beam to the erection angle in a manner consistent with standards promulgated pursuant to the OSH Act. Among other things, these regulations provide that:

> During the final placing of solid web structural members, the load shall not be released from the hoisting line until the members are secured with not less than two bolts, or the equivalent at each connection and drawn up wrench tight.

29 C.F.R. § 1926.751(a) ("the connection rule"[1]). The regulations also provide that:

> The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury.

29 C.F.R. § 1926.21(b)(2) ("the training rule").

The indictment alleges that PDM violated a provision of the OSH Act imposing criminal penalties on employers who willfully violate regulations promulgated under the OSH Act where the violation causes the death of an employee. Specifically, the OSH Act provides that:

> Any employer who willfully violates any standard, rule, or order promulgated pursuant to [the OSH Act], or of any regulations prescribed pursuant to [the OSH Act], and that violation caused death to any employee, shall, upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than six months, or by both.

29 U.S.C. § 666(e) ("Section 666(e)"). In order for the jury to convict PDM of violat-

---

1. For reasons explained below, the court declines to refer to this regulation as the "two bolt rule" and precludes the government from using or eliciting such a reference.

ing Section 666(e), the government will have to prove beyond a reasonable doubt that:

(1) PDM violated the connection rule, or the training rule, or both; and

(2) the violation was willful; and

(3) the violation was the cause in fact of the deaths of the two ironworkers; and

(4) the violation was the legal cause of the deaths of the two ironworkers.[2]

### *The Government's Motions in Limine*

The government has filed three motions in limine, concerning other causes of the fatal collapse, the necessity of OSH Act standards, and industry practices.

## I. OTHER CAUSES OF THE FATAL COLLAPSE

The government moves the court to exclude evidence and argument suggesting that Erection Angle A–1285 was improperly designed, and that this improper design caused the collapse of steel members on November 3, 1993 ("the collapse"). More generally, the government moves the court to exclude evidence of other possible causes of the collapse. The government argues that such evidence is irrelevant under Rules 401 and 402 of the Federal Rules of Evidence, and that such evidence is confusing and misleading under Rule 403 of the Federal Rules of Evidence. In response, PDM argues that the design of Erection Angle A–1285 is relevant to (1) whether PDM willfully violated the connection rule and (2) whether PDM's alleged violation caused the death of the two ironworkers. The court will deal with the second issue first.

### A. Causation

In order to convict PDM of violating Section 666(e), the government will have to prove beyond a reasonable doubt that PDM

willfully violated the connection rule (or the training rule), and that this violation *caused* the deaths of the two workers on November 3, 1993. Before discussing the specific causation issues raised by this case, it will be helpful to lay out some general principles of causation.

### 1. Causation in General

■ In order to convict a defendant of a criminal offense that includes a causation element, the government must prove beyond a reasonable doubt that the defendant's conduct was *both* the "cause in fact" *and* the "legal cause" of the relevant harm. *See* 22 C.J.S. *Criminal Law* § 45, at 51 (1989); Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 3.12, at 390, 392 (2d ed.1986); Paul R. Robinson, *Criminal Law Defenses* § 88(b) (1984); *United States v. Neadle*, 72 F.3d 1104, 1119–20 (3rd Cir.1995) (Becker, J., dissenting), *cert. denied,* —— U.S. ——, 117 S.Ct. 238, 136 L.Ed.2d 168 (1996); *United States v. Spinney*, 795 F.2d 1410, 1415 (9th Cir.1986).

■ To prove that a defendant's conduct was the "cause in fact" of a harm, the government usually must demonstrate that the defendant's conduct was the "but-for cause" of the harm. In other words, the government must show that but for the defendant's conduct, the harm would not have occurred. *See* 22 C.J.S. at 51; LaFave & Scott at 390, 392, 393–94; Robinson §§ 88(a)–88(d)(1). A defendant rebuts this argument by showing that the harm would have occurred in any event, regardless of the defendant's conduct. In certain highly unusual cases, it is logically impossible for the government to prove "but-for" causation because "two causes, each alone sufficient to bring about the harmful result, operate[d] together to cause it." LaFave & Scott at 394.[3] In such cases, the

---

**2.** The first and second elements come from the text of Section 666(e), while the third and fourth elements stem from the court's analysis of the causation issue below.

**3.** LaFave & Scott offer the following two examples:

In torts law there is the situation where A wrongfully (intentionally or negligently) starts a fire which by itself is sufficient to burn B's prop-

erty, while at about the same time X (wrongfully or innocently) or lightning starts another fire also sufficient to burn B's property. The two fires meet and combine and burn B's property. Here one cannot say that but for A's conduct B's property would have been burned. Yet A is held to have caused the injury to B's property.

In the criminal law too the situation sometimes arises where two causes, *each alone sufficient to*

government may still prove cause in fact by demonstrating that the defendant's conduct was a "substantial factor" in bringing about the harm. *Id.* at 394–95.[4] In the absence of such special causation problems, there is no need to employ the substantial factor test, because the "but-for cause" of a harm is always a substantial factor in bringing about the harm. *Id.; see Neadle,* 72 F.3d at 1120 (Becker, J., dissenting) ("Because the facts do not present any special causation problems, I need only apply the standard 'but for' test.").

 To prove that a defendant's conduct was the "legal cause" (or "proximate cause") of a harm, the government must prove that the harm was a foreseeable and natural result of the conduct. 22 C.J.S. *Criminal Law* § 45 at 51; *see Spinney,* 795 F.2d at 1416 (defendant's conduct was legal cause of death because death was foreseeable result of conduct). To convict a defendant of involuntary manslaughter, for example, the government must prove that the victim's death was "within the risk foreseeably created by the accused's conduct." *United States v. Main,* 113 F.3d 1046, 1049 (9th Cir.1997) (citation omitted); *see* LaFave & Scott at 390, 392–93, Thus, "[e]ven where a but-for relation exists, a defendant may yet escape liability if the harmful result caused is so remote or accidental in its manner of occurrence as to make it unjust to hold the defendant liable for it." Robinson § 88(b) (footnote omitted)

Although the "substantial factor test" was developed to address some unusual cases in the cause-in-fact context, as explained above, this test has apparently spilled over into the legal-cause context in some recent cases. In Main, for example, the Ninth Circuit stated that:

> *bring about the harmful result,* operate together to cause it. Thus A stabs B, inflicting a fatal wound; while at the same moment X, acting independently, shoots B in the head with a gun, also inflicting such a wound; and B dies from the combined effects of the two wounds. It is held that A has caused B's death.
> LaFave & Scott at 394 (emphasis added) (footnotes omitted); see also Robinson §§ 88(d)(2)–88(d)(3) (discussing concurrent and consecutive causes).

4. In such cases, LaFave and Scott explain, "the test for causation-in-fact is more accurately

All of the authorities agree that to be guilty of involuntary manslaughter the harmful result must be within the risk foreseeably created by the accused's conduct; if the physical causation is too remote, the law will not take cognizance of it. *"The same result has been achieved by requiring that the accused's conduct be a substantial factor in causing the harmful result or that it be the proximate, primary, direct, efficient, or legal cause of such harmful result."*

*Main,* 113 F.3d at 1049 (emphasis added) (citation omitted). Relying on these concepts, the Ninth Circuit developed a new jury instruction for involuntary manslaughter cases, which included the following statement: *"A proximate cause is one which played a substantial part in bringing about the death,* so that the death was the direct result or a reasonably probable consequence of the defendant's speed or condition or manner of driving." *Id.* at 1050 (emphasis added).

While there is no denying that some recent cases have imported the substantial factor test from the cause-in-fact context and into the legal-cause context, this development seems to make little sense in terms of legal theory or logic. As explained above, the substantial factor test addresses factual, physical causation in a narrow range of cases in which "but-for" causation cannot be proven. By contrast, legal causation concerns foreseeability and fairness—not factual, physical causation. Whether a defendant's conduct was factually, physically a substantial factor in bringing about the relevant harm has little (if any) bearing on the question of whether the harm was within the risk

worded, not in terms of but-for cause, but rather: Was the defendant's conduct a *substantial factor* in bringing about the forbidden result?" LaFave & Scott at 394–95 (emphasis added); *see also Neadle,* 72 F.3d at 1119 (Becker, J., dissenting) ("Courts sometimes apply a different test—the 'substantial factor' formulation—to special causation problems not adequately addressed by the 'but for' test. For example, when the conduct of each of two actors acting independently could have caused the harm at issue, and thus neither is the 'but for' cause, courts generally hold both actors liable under the substantial factor test.").

foreseeably created by the accused's original conduct. Causation in fact is concerned with what actually happened on the ground, while legal causation is concerned with what could have been foreseen beforehand. The substantial factor test concerns what actually happened on the ground (causation in fact), not what kinds of harms could have been foreseen (legal causation). For these reasons, the recent tendency to import the substantial factor test into the legal-cause context appears to have no basis in legal theory or logic. In any event, the court is not aware of any case or treatise explaining or justifying this tendency in theoretical or logical terms.

Although there appear to be no published opinions defining causation under Section 666(e), the government has located a jury instruction given by then District Judge (now Circuit Judge) Terence Evans in a Section 666(e) case. According to the government, in *United States v. S.A. Healy Co.*, 90 CR 123 (E.D. Wisconsin ), Judge Evans instructed the jury that:

A death is said to be "caused" by an act or failure to act, whenever it appears that the act or omission played a substantial part in bringing about or actually causing the death. This does not mean that the law recognized only one cause of death. On the contrary, many factors may operate at the same time, either independently or together, to cause a death. The element of causation is proven in this case if the jury finds that a willful violation of an OSHA regulation was a substantial factor in causing the death of an employee.

(Gov't's Mots. in Lim. at 8.) Unfortunately, the court has no information about the facts of the *Healy* case, the specific violations alleged in that case, the debate (if any) over the jury instruction just quoted, the other jury instructions given, the outcome of the trial, and the outcome of the appeal (if any).

Without such information it is difficult for the court to assess the appropriateness of the jury instruction just quoted—either in *Healy* itself or in the present case.[5]

## 2. Causation in This Case

Before considering the issue of causation in this case, it may be worth repeating that in order for the jury to convict PDM of violating Section 666(e), the government will have to prove beyond a reasonable doubt that:

(1) PDM violated the connection rule, or the training rule, or both; and

(2) the violation was willful; and

(3) the violation was the cause in fact of the deaths of the two ironworkers; and

(4) the violation was the legal cause of the deaths of the two ironworkers.

As a logical matter, this means that the jury will not reach the issue of causation unless it first finds that (1) PDM violated the connection rule or the training rule and (2) this violation was willful.

With respect to causation in fact in this case, the government intends to prove beyond a reasonable doubt that *but for* PDM's violation of the connection rule (or the training rule) the two ironworkers would not have died. (Gov't's Mots. in Lim. at 5.) The "but-for" test should be used to determine causation in fact in this case. This is not one of those unusual cases in which "two causes, each alone sufficient to bring about the harmful result, operate[d] together to cause it," LaFave & Scott at 394,[6] so the "substantial factor" test will not be used to determine causation in fact, *id.; see Neadle,* 72 F.3d at 1119 (Becker, J., dissenting).[7]

If PDM wishes to rebut the government's argument that but for PDM's violation the two ironworkers would not have died, PDM will have to argue that the two ironworkers

---

5. To the extent that the instruction imports the substantial factor test from the cause-in-fact context into the legal-cause context (or conflates cause in fact and legal cause), it may be problematic. Without knowing more about the *Healy* case, the court cannot make this determination.

6. Compare the facts of this case to the facts of the two cases described in footnote 3.

7. In any event, the "but-for cause" of a harm is always a substantial factor in bringing about the harm. LaFave & Scott at 394. Therefore, if the government proves that PDM's violation was the but-for cause of the workers' deaths, it will have satisfied both the but-for test and the substantial factor test for proving causation in fact.

would have died whether or not PDM abided by the connection rule and the training rule. Focusing on the connection rule specifically, PDM could argue that

(1) PDM did not violate the connection rule because it used the equivalent of two bolts; and

(2) any violation of the connection rule was not willful because PDM believed in good faith that it was using the equivalent of two bolts; and

(3) even if PDM willfully violated the connection rule, this violation was not the but-for cause of the workers' deaths: the steel members would have collapsed and the two ironworkers would have died whether or not PDM abided by the connection rule.

If PDM's evidence regarding the design of Erection Angle A–1285 were to show that even if PDM had abided by the connection rule the steel members would still have collapsed and the ironworkers would still have died, then this evidence would be relevant to the issue of cause in fact. However, if PDM's evidence regarding the design of Erection Angle A–1285 does not show this, then it is not relevant to the issue of cause in fact.

 In its motion in limine, the government conceded that "if PDM has evidence that Erection Angle A–1285 was so poorly designed that the collapse would have occurred even if it had been properly bolted to Collector Beam A–3550, this evidence probably would be relevant." (Gov't's Mots. in Lim. at 11.) In light of this concession, the court assumes that if PDM had evidence to this effect, it would say so in its response to the government's motion in limine. However, at no point in its response does PDM argue, state, or suggest that it has such evidence. Therefore, the court assumes that PDM does not have such evidence. Absent any future representation by PDM to the contrary, the court concludes that the design of Erection Angle A–1285 is irrelevant to the issue of causation in fact.

 Whether the design of Erection Angle A–1285 has any relevance to the issue of legal causation presents a more difficult question. To prove that PDM's alleged violation of the connection rule was the legal cause of the ironworkers' deaths, the government must prove that the deaths were a foreseeable and natural result of the violation. See 22 C.J.S. *Criminal Law* § 45 at 51; *Spinney,* 795 F.2d at 1416. That is, the government must prove that the deaths were within *the risk foreseeably created* by PDM's alleged violation of the connection rule. *See Main,* 113 F.3d at 1049. The question then is this: When PDM willfully violated the connection rule,[8] could PDM foresee that it was creating a risk that steel members would collapse and kill construction workers?

In this regard, one can imagine a situation in which a violation of the connection would *not* be the legal cause of a worker's death even though the violation was the cause in fact of the worker's death. Consider a scenario in which a company's failure to abide by the connection rule were to result in a pile of unused bolts left on the sidewalk, and a worker were to trip on the pile of bolts, fall under a moving forklift, and die as a result. Under this scenario, if the company had abided by the connection rule, it would have used up all of the bolts and the worker would not have tripped and died; but for the violation, the worker would not have died. However, having a worker trip on a pile of bolts and fall under a moving forklift is an extremely improbable event—not a foreseeable result of violating the connection rule. Therefore, the violation would be the cause in fact but not the legal cause of the worker's death. Admittedly, the scenario just described is highly fanciful. But that is exactly the point of legal causation: to relieve defendants of liability for events they could not possibly have foreseen.[9]

The question in this case, as noted above, is whether PDM could foresee that violating the connection rule created a risk that steel

---

**8.** As noted above, the jury will not reach any causation issues unless it first determines that PDM willfully violated the connection rule (or the training rule).

**9.** For a parallel example in the homicide context, *see* Robinson § 88(b).

members would collapse and kill construction workers. If PDM wishes to rebut the government's evidence on legal causation, PDM will have to argue that it could not have foreseen that violating the connection rule created a risk that steel members would collapse and kill construction workers. Evidence that the erection angles PDM used were unsafe (or that PDM believed they were unsafe) would not support such an argument and would not be relevant to the issue of legal causation. Indeed, evidence that the erection angles PDM used were unsafe (or that PDM believed they were unsafe) would contradict such an argument. (*See* Gov't's Reply at 3–4.)

PDM argues that the allegedly defective design of Erection Angle A–1285 is relevant because it shows that PDM's supposed violation of the connection rule was not a *substantial factor* resulting in the death of the two ironworkers. This argument is unpersuasive for a number of reasons. First, as noted above, this is not one of those unusual cases in which "two causes, each alone sufficient to bring about the harmful result, operate[d] together to cause it," LaFave & Scott at 394, so the substantial factor test will not be used to determine causation in fact. Second, as noted above, the substantial factor test does not shed any light on the issue of legal causation, which concerns what could have been foreseen rather than what actually happened.

Third, PDM has not cited a single case, treatise, or other authority supporting its assertion that the substantial factor test is a comparative test, while the government has cited a Seventh Circuit case suggesting exactly the opposite. In *Tragarz v. Keene Corp.,* 980 F.2d 411 (7th Cir.1992), the Seventh Circuit held that

> Illinois courts in applying the substantial factor test do not seem concerned with which of the many contributing causes are *most* substantial. Rather, they seem concerned with whether each contributing cause, *standing alone,* is a substantial factor in causing the alleged injury. We derive this interpretation from Illinois cases . . . which emphasize that "there can be

more than one proximate cause of an injury."

Id. at 424–25 (quoting *Lipke v. Celotex Corp.,* 153 Ill.App.3d 498, 106 Ill.Dec. 422, 430, 505 N.E.2d 1213, 1221 (1987)) (first emphasis in original; second emphasis added). Although *Tragarz* interpreted Illinois law rather than federal law, fundamental principles of causation in criminal cases have generally been developed by state courts. PDM offers no reason that federal law should differ from Illinois law regarding the substantial factor test, and PDM offers no authority for questioning the validity of the rule enunciated in *Tragarz. See also Neadle,* 72 F.3d at 1119 (3rd Cir.1995) (Becker, J., dissenting) ("[W]hen the conduct of each of two actors acting independently could have caused the harm at issue, and thus neither is the 'but for' cause, *courts generally hold both actors liable* under the substantial factor test.") (emphasis added) (citation omitted).

Fourth, the legislative history of Section 666(e) does not support any sort of special or heightened causation requirement. Like many federal statutes, the OSH Act of 1970 reflected a compromise between competing proposals developed by the Senate and the House of Representatives. The original Senate bill imposed criminal penalties on all employers who willfully violated standards promulgated under the OSH Act. 116 Cong. Rec. H42201 (Conf. Rep. on OSH Act of 1970). By contrast, the House amendment imposed a civil penalty for willful or repeated violations. *Id.* As a compromise between these two versions, the final version of the OSH Act "requires that the willful violation of the standard or the rule, regulation or order result in death to an employee, for the employer to be subject to the criminal penalties." *Id.*

Neither the substance nor the language of this compromise support any sort of special or heightened causation requirement in prosecutions brought under Section 666(e). In terms of substance, the Conference Committee was looking for a way to impose criminal penalties on some willful violations without imposing criminal penalties on *all* willful violations. The Conference Committee apparently drew this line by imposing criminal

penalties only on those willful violations that resulted in death. In terms of language, the repeated [10] use of the phrase *"resulted in death"* as a substitute for the words "caused death" in the statute suggests that Congress had in mind a straightforward fact-based inquiry into whether the violation led to any deaths—as opposed a more stringent (and potentially more complicated) inquiry into whether the violation was a substantial factor in causing any deaths.

For all of these reasons, the court concludes that evidence and argument suggesting that Erection Angle A–1285 was improperly designed has no relevance to the issue of causation

### B. Willfulness

■ PDM also argues that evidence about Erection Angle A–1285 is relevant to PDM's arguments that (1) it did not violate the connection rule, and (2) any violation was not willful. Specifically, PDM argues that

> it is a valid defense that the connection between Collector Beam A–3550, Column A 1469, using Erection Angle A–1285 as a vertical support, and at least one bolt to prevent horizontal shifting, was the equivalent of a two bolt connection without a seat angle. Even if the connection was not the equivalent of a two-bolt connection, it is a valid defense that PDM's good faith belief that the connection met the equivalency requirement stated in the standard negated the willfulness of the violation.

(PDM's Resp. at 6.) From this argument PDM concludes that "all evidence regarding the connection at issue is directly relevant to PDM's defense that it acted in good faith compliance with the OSHA standard and therefore did not commit a willful violation of the OSHA Act." (*Id.* at 7.) The court agrees that PDM may argue that it complied with the connection rule by using the equivalent of two bolts. Therefore, any evidence tending to show that the connection PDM used was equivalent to two bolts is relevant and admissible. Moreover, the court agrees that PDM may argue that any violation was not willful

because PDM believed it was complying with the connection rule. Therefore, any evidence tending to show that PDM believed that the connection it used was equivalent to two bolts is relevant and admissible.

However, the court disagrees with PDM's conclusion that *"all* evidence regarding the connection at issue is directly relevant." That some evidence regarding Erection Angle A1285 is relevant and thus admissible does not mean that all evidence regarding Erection Angle A1285 is relevant and thus admissible. Unless and until PDM can explain how evidence regarding the improper design of Erection Angle A1285 is relevant to this case, the court will not admit it. The government's first motion in limine concerning other causes of the collapse is granted.

## II. NECESSITY OF OSHA STANDARDS

The government moves the court to exclude any evidence or argument suggesting Occupational Safety and Health Administration ("OSHA") standards at issue in this case "are not necessary or advisable, and/or that [PDM] believed in good faith that its bolting practices were safe even if not strictly in compliance with OSHA standards." (Gov't's Mots. in Lim. at 13–14.) In its response. PDM explains that "PDM's position is *not* that it implemented an acceptable alternative to the OSHA standard, but that it met the standard or in good faith believed that it met the standard." (PDM's Resp. at 8 (emphasis in original).) In its reply, the government states that "[t]here is no dispute that PDM may introduce evidence relevant to its alleged belief that it was in compliance with OSHA standards." (Gov't's Reply at 4.) Based on this frank exchange of views, it is apparent that PDM has no desire to argue— as the government feared—that "the OSHA standards at issue are not necessary or advisable, and/or that [PDM] believed in good faith that its bolting practices were safe even if not strictly in compliance with OSHA standards." (Gov't's Mots. in Lim. at 13–14.) Therefore, the government's second motion

---

**10.** *E.g.,* 116 Cong. Rec. H42201 (Conf. Rep. on OSH Act of 1970), 42203 & 42205 (remarks of Rep. Daniels); C. Rep. No. 91–1765, *reprinted in*

1970 U.S.C.C.A.N. 5228, 5237–38 ("Statement of the Managers on the Part of the House").

in limine to exclude evidence concerning the necessity of the OSHA standards is granted.

 That is not quite the end of the story, however. In its response brief, PDM states that

> PDM expects the evidence to show that a seat angle connection with at least one bolt is equivalent to a two-bolt connection without a seat angle. PDM will demonstrate that such a connection has sufficient load bearing capacity to prevent a vertical collapse, with at least one bolt preventing the beam from shifting horizontally. PDM's theory is that a seat angle connection with at least one bolt meets the OSHA standard by being equivalent to a two-bolt connection without a seat angle.

(PDM's Resp. at 7.) In its reply brief, the government objects to this statement on several grounds. Because the government's objections raise significant evidentiary issues, the court will address each of the government's objections here.

First, the government states that

> the proposed evidence about the seat angle's load bearing capacity is irrelevant to the issue of PDM's willfulness if PDM can not show that it was aware of the evidence prior to the collapse and relied on it in forming its alleged belief that it was in compliance with OSHA standards.

(Gov't's Reply at 5.) The court agrees with this statement. However, the court adds that the proposed evidence about the seat angle's load bearing capacity is directly relevant to the issue of whether PDM *actually* violated the connection rule—provided that PDM addresses the concerns expressed in the next paragraph.

Second, the government argues that PDM's proposed evidence about the seat angle's load bearing capacity

> appears irrelevant to the issue of whether PDM was actually in compliance with the two-bolt rule at the fatal connection under an "equivalent" theory. . . . The claim that a particular one-bolt connection "has a sufficient load bearing capacity to prevent a vertical collapse, with at least one bolt preventing the beam from shifting horizontally," even if true, does not mean that the

connection is in compliance with the two-bolt rule. For one thing, PDM nowhere states that the connection has the *equivalent* load bearing capacity of the same connection made with two bolts wrench tight.

(*Id.*) (emphasis in original.) The court agrees with the government that PDM must frame its evidence and argument in terms of whether the connections it used were equivalent to two bolts, not whether the connections it used were "sufficient" or "safe" or anything other than "equivalent to two bolts." In order to do this, PDM will (presumably) have to introduce testimony of individuals familiar with the construction industry regarding the meaning of the term "equivalent to two bolts." In its effort to prove beyond a reasonable doubt that PDM did not use the "equivalent of two bolts," the government will (presumably) have to introduce testimony of individuals familiar with the construction industry regarding the meaning of the term "equivalent to two bolts."

 Third, the government argues that "PDM should be precluded as a matter of law from arguing that it was actually in compliance with the two-bolt rule because one bolt was sufficiently safe and therefore 'the equivalent' of two bolts when used with a seat angle." (*Id.* at 7.) In support of this argument, the government argues that

> The obvious purpose of the two-bolt rule was to take away an employer's discretion to decide on a case-by-case basis that it needs only one bolt in a connection rather than two. While the rule does permit the use of "the equivalent" of two bolts wrench tight (*e.g.*, a clamp), allowing employers unilaterally to decide that one bolt is the equivalent of two would create a loophole so huge as to render the two-bolt rule meaningless.

(*Id.* at 6–7.) There are several problems with this argument. The purpose of the two-bolt rule is by no means obvious. If the purpose of the rule were to require exactly two bolts under all circumstances, then the words "or the equivalent" would be rendered entirely meaningless. It is a fundamental tenet of statutory interpretation that laws will not be interpreted in a manner that

renders words in the law meaningless. For this reason, the court does not accept the government's invitation to read the words "or the equivalent" out of the rule. Facing possible criminal liability for allegedly violating a rule requiring "two bolts or the equivalent.," PDM is entitled to argue that it used "the equivalent." [11]

In sum, the court grants the government's second motion in limine excluding evidence concerning the necessity of OSHA standards. In keeping with this ruling, the court precludes PDM from arguing that any OSHA standard is unnecessary or ill-advised, or that PDM's connections were "sufficient" or "safe." However, the court will not preclude PDM from arguing that its connections were the equivalent of two bolts, assuming it has evidence supporting this argument. PDM needs to make an offer of proof at the hearings scheduled in this matter,

## III. INDUSTRY CUSTOM OR PRACTICE

 The government moves the court to exclude evidence of industry custom or practice, fearing "that PDM may attempt to defend this case in part by presenting evidence and arguing that non-compliance with OSHA's two-bolt rule is commonplace in the steel erection industry." (Gov't's Mots. in Lim. at 16.) In response, PDM makes two major arguments.

First, PDM argues that "industry customs and standards supply the 'context' necessary to determine if the standards were violated.... [E]vidence of industry customs and practices is certainly admissible to provide needed clarification and context." (PDM's Resp. at 9–10.) The court is not persuaded by this argument. Presenting evidence of industry customs and standards poses a real danger of misleading the jury by suggesting that PDM is not guilty because "everyone does it." Such a suggestion (whether explicit or implicit) would defeat the purpose of the OSH Act by letting employers "avoid compli-

ance with specific safety mandates by relying on the (perhaps equally objectionable) practices of their peers." *Faultless Division v. Secretary of Labor,* 674 F.2d 1177, 1187 (7th Cir.1982). In the face of such potential prejudice, PDM will have to identify the concrete probative value of such evidence with respect to a specific element of this case if it wishes to have such evidence admitted. Providing general "clarification and context" is not enough to overcome the potential prejudice just described.

 Second, PDM argues that industry customs and practices is relevant to defining the "equivalent" of two bolts. The court agrees, provided that PDM's evidence focuses narrowly on the "customary" equivalent of two bolts—what persons working in the construction industry use as the equivalent to two bolts, or what persons familiar with the construction industry regard as equivalent to two bolts. *See generally Century Steel Erectors, Inc. v. Dole,* 888 F.2d 1399, (D.C.Cir. 1989) (admitting evidence of industry practice to help define the word "impractical" in regulation requiring safety nets where other specific measures are "impractical"). As noted in the previous paragraph, however, the court will not permit PDM to introduce unfocussed general evidence about standard practices.

In sum, evidence regarding industry customs and practices must directly address the equivalence issue. In its response, PDM states that "[t]he 'or equivalent' language indicates that two bolts may not always be possible or desirable. Evidence of industry customs or practices is needed to show when two bolts are not possible or desirable, and what constitutes an equivalent connection." (PDM's Resp. at 12.) The court will admit evidence of industry customs and practices focused on "what constitutes an equivalent connection." However, the court will not admit evidence of industry customs and practices focused on "when two bolts are not

---

11. The government cites this court's prior statement that "the regulation is quite clear that at no time can employer use less than two bolts when fastening in place a finally positioned object." (Gov't's Reply at 7 (citing Mem. Op. dated June 12, 1997, at. 14.)) However, this statement is

taken out of context. In context, the point of this statement is that the connection rule provides a clear, concrete, minimum standard: An employer using two bolts wrench tight can be certain he is complying with the connection rule.

possible or desirable." The question is not whether two bolts are always possible or desirable. The question is: when two bolts are not used (for whatever reason), is the substitute practice equivalent to two bolts? Why PDM did not use two bolts is irrelevant. Whether PDM used the equivalent of two bolts is highly relevant.[12]

The government insists that the connection rule is "sufficiently specific without reference to industry customs or practices." (Gov't's Mots. in Lim. at 18.) However, an average juror, unfamiliar with the construction industry, will not know the equivalent of two bolts. Without testimony by persons familiar with the construction industry regarding the meaning of the word "equivalent," the jury cannot possibly determine whether PDM used the equivalent of two bolts. There is no logical reason why such testimony could not refer to the *customary* equivalent of two bolts, if there is such a thing. While the government seems confident that "a clamp" is the equivalent of two bolts wrench tight (Gov't's Reply at 7), that fact is hardly self-evident. Since the focal point of the trial in this case will be the definition of the word "equivalent," the court is reluctant to exclude any evidence that directly addresses that issue.

The government's third motion in limine on industry custom or practice is granted in part and denied in part.

### PDM's Motions in Limine

PDM has filed four motions in limine, concerning experts' reports, unrelated connections, videotape evidence, and references to the "two bolt rule."

## I. EXPERTS' REPORT

PDM moves the court to exclude certain reports and (presumably) testimony about these reports. These reports concern tests conducted by the government's experts on

Erection Angle A–1285. For reasons set forth below, the court denies this motion.

Initially, PDM argues that the court should exclude the reports and (presumably) testimony about the reports because they "are based on testing that destroyed exculpatory or potentially exculpatory evidence." This argument—unsupported by any affidavits or other evidence—is completely without merit. First, PDM and OSHA entered into a five-page agreement concerning custody and testing of the structural steel involved in the collapse. (Gov't's Resp., Ex. A.) Second, OSHA sent PDM's attorney a draft protocol for the testing it intended to conduct and invited PDM to comment. (*Id.*, Ex. C.) Third, OSHA notified PDM's attorneys of its plan to test the erection angle and invited PDM to observe the procedure. (*Id.*, Ex. D.) Fourth, PDM's retained experts did in fact observe the testing. (*Id.*, Ex. E ¶ 2.) At no point during the events just described did PDM, PDM's attorneys, or PDM's experts object to the proposal to test the erection angle or the actual testing itself. Fifth, the testing at issue did not damage the erection angle in any material way. (*Id.* Ex. E ¶ 3.) Finally, in its reply brief, PDM does not deny any of the facts in this paragraph. For these reasons, the court denies as frivolous this portion of PDM's first motion in limine.

Second, PDM argues that a report prepared by members of the Purdue University School of Engineering ("Purdue Report") lacks probative value because it fails to replicate certain conditions of the accident on November 3, 1993. However, at no point, does PDM allege that the Purdue Report is irrelevant or that it has no basis in scientific methodology. Therefore, the Purdue Report is admissible under Rule 702 of the Federal Rules of Evidence. *See generally Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[13] PDM's objections to the Purdue Report clearly go to the weight—

---

12. In its response to the government's third motion in limine, PDM suggests that the government must prove that PDM violated both the connection rule and the training rule. This argument is completely without merit: Section 666(e) makes it a criminal offense to violate any single safety standard where death results.

13. Significantly, all of the cases cited by PDM precede the Supreme Court's seminal discussion of Rule 702 in *Merrell Dow*.

not the admissibility—of the evidence. In this regard, PDM is of course entitled to cross-examine the government's experts and to ask its own experts to evaluate the Purdue Report.

■ Third, PDM argues that the government failed to produce Part II of the Purdue Report in a timely fashion. Specifically, PDM states that

The experiments on which the [Purdue] Report is based were conducted between May and November 1996 and were completed at the time the government produced Part I of the Purdue Report. Despite this fact, the government did not produce the Part II of the Report until May 23, 1997. Given the extensive nature of the experiments contained in the Part II of the Purdue Report, it is fundamentally unfair for the government to be able to use such results after concealing the results for a period of five months or more.

(PDM's Mem. in Supp. of Mot. on Experts' Reports at 7.) In response, the government states that

The government has concealed nothing. PDM correctly states that the Purdue experts completed their testing in November; 1996, but it fails to mention that the experts did not finish writing up the results until May 1997 (despite repeated requests by the government to finish sooner).... The government thus did not have a final report "within its possession, custody,, or control" until the third week in May [of 1997], and once it had the report it produced it to PDM within a day or two.

(Gov't's Resp. at 8.) In its reply brief, PDM does not take issue with the government's explanation for the delay in producing Part II of the Purdue Report. Like PDM, the court has no reason to doubt that the government urged members of the Purdue University School of Engineering to produce Part II of their report as soon as possible, or that the government turned Part II of the Purdue Report over to PDM within a day or two of

the date the government finally received the report. In short, it does not appear the government purposely concealed any part of the Purdue Report from PDM. In any event, by the time the trial begins in this case, PDM will have had more than seven weeks to dissect Part II of the Purdue Report. This is clearly a sufficient amount of time, and PDM can not seriously argue that it has been prejudiced.[14]

For these reasons, the court denies PDM's first motion in limine to exclude certain reports and (presumably) testimony about those reports.

## II. UNRELATED CONNECTIONS

■ PDM moves the court to exclude evidence indicating that PDM did not use two bolts to secure connections other than the single connection that failed on November 3, 1993. In particular, PDM seeks to exclude a series of letters between the United States Postal Service, the general contractor on the post office project, and PDM informing PDM that it was not complying with the connection rule and that it was required to comply with the connection rule. PDM argues that this "evidence regarding other connections" is irrelevant and prejudicial.

The court disagrees. Evidence showing that seven months before the fatal accident at issue in this case the Postal Service informed PDM that it was violating the connection rule is directly relevant to whether PDM *willfully* violated the connection rule on November 3, 1993. It is undisputed that the failure to comply with a rule promulgated pursuant to the OSH Act is willful "if done knowingly and purposely by an employer who, having a free will or choice, either intentionally disregards the standard or is plainly indifferent to its requirement." *United States v. Dye Const. Co.*, 510 F.2d 78, 81 (10th Cir.1975) (seminal case). The exchange of letters at issue here is plainly relevant to the issue of willfulness because

---

14. According to the government, PDM did not produce its two expert reports until May 30, 1997 a week after the government produced Part II of the Purdue Report. (Gov't's Resp. at 8.) In its reply brief, PDM does not dispute this. If PDM was prejudiced by the date it received Part II of the Purdue Report, the government was even more prejudiced by the date it received PDM's experts' reports.

it tends to show that PDM acted knowingly and purposefully when it used the type of connections it used. Moreover, evidence regarding connections other than the connection that failed on November 3, 1993 is directly relevant to the government's contention that PDM violated the training rule. That PDM's employees did not abide by the connection rule tends to show that PDM did not properly train its employees.

PDM objects that evidence of other connections is prejudicial because the other connections were different from the connection that failed. (PDM's Mem. in Supp. of Mot. on Unrelated Connections at 5, 11.) However, this objection is not supported by any evidence, and it is contradicted by the deposition testimony of PDM's area superintendent. (Gov't's Resp., Ex. F.) Moreover, there is nothing stopping PDM from pointing out the differences (if any) between the connection that failed and other connections identified by the government. PDM also worries that the jury will assume that when PDM necessarily made the connection that failed in the same manner that it made the other connections at issue. However, any danger of this occurring can be counteracted by a limiting jury instruction; and in any event this risk of unfair prejudice does not come close to outweighing the probative value of the evidence noted above. PDM's second motion in limine to exclude evidence of unrelated connections is denied.

### III. VIDEOTAPE EVIDENCE

PDM moves the court to preclude the government from introducing into evidence videotapes of rescue and recovery operations in the wake of the accident on November 3, 1993. According to PDM, these videotapes include graphic scenes of injury as well as depictions of connections other than the connection that collapsed. (PDM's Mem. in Supp. of Mot. on Videotape Evidence at 2–3.) In its response, the government states that it "already has told counsel for PDM that if the government decides to play the videotape at all, it might be willing to edit out such [graphic scenes of injury], if PDM would be willing to stipulate to such non-controversial matters such as the deaths of the workers."

(Gov't's Resp. at 12.) However, the government insists that it is entitled to show other connections (for reasons discussed above) and that "videotape of the collapse scene obviously would help the jury visualize the scene, which likely would help it better understand the somewhat technical matters that will be raised at trial." *(Id.)*

Although the government may be entitled to show other connections (for reasons discussed above), it is beyond dispute that scenes of injury and destruction have the potential to be highly emotional. Without seeing the portions of the videotapes that the government seeks to introduce into evidence, the court can not perform the kind of balancing required under Rule 403 of the Federal Rules of Evidence. And such a balancing may not be necessary at all if the government and PDM can reach an agreement resolving some or all of the issues raised by PDM's motion in limine.

To expedite the resolution of this issue, the court orders the government to identify those portions of the videotapes that it may wish to introduce into evidence on or before July 8, 1997. The court orders the government and PDM to try to reach an agreement on the use of such videotape evidence, including any stipulations by PDM that would make the presentation of videotape evidence unnecessary. If these negotiations fail to resolve all of the disagreements between the government and PDM, the court will reconsider this matter. PDM's third motion in limine on videotape evidence is denied without prejudice.

### IV. THE TWO–BOLT RULE

PDM moves the court to preclude the use of the phrase "two bolt rule." The court agrees with PDM that this phrase is highly misleading because the rule it refers to requires "not less than two bolts, or the equivalent." Since one of PDM's main arguments in this case is that it used "the equivalent," it is inappropriate to refer to the rule as the "two bolt rule." In response, the government points out that referring to the rule as "29 C.F.R. § 1926.751(a)" would be cumbersome, and that PDM has not proposed any alternative label. However, the

court has proposed an alternative label: "the connection rule." This label satisfies PDM's concern that it not be prejudiced (on the one hand) and the government's concern that it have a shorthand way of referring to 29 C.F.R. § 1926.751(a) (on the other hand). The court will hear the parties objections, if any, to this alternative at oral argument. PDM's fourth motion in limine is granted.

### Recent Filings

In its fourth motion in limine, PDM states that it intends to offer evidence concerning the source of the connection rule in the form of a standard developed by the Massachusetts Department of Labor and Industry. (PDM's Mot. in Lim. on Two Bolt Rule at 3.) In its response to PDM's fourth motion in limine, the government moves the court to exclude such evidence. This raises two critical issues: whether the meaning of the word "equivalent" is to be interpreted by the court or the jury, and on what basis such a determination should be made. Given the critical nature of these issues, the court will not rule on the government's motion to exclude the Massachusetts standard until PDM has had an opportunity to reply to the government's arguments. If PDM wishes to file a response to the government's arguments, it must do so on or before July 9, 1997.

In addition, the government recently filed a motion in limine to exclude certain expert opinion and a motion in limine concerning "employee" issue. If PDM wishes to file a response to these motions, it must do so on or before July 9, 1997.

### Conclusion

The government's motions in limine filed May 30, 1997 are granted in part and denied in part. (The first two are granted and the third is granted in part and denied in part.) Defendant PDM's motion in limine on experts' reports and its motion in limine on unrelated connections are denied. The court denies PDM's motion in limine on videotape evidence without prejudice, orders the government to identify relevant portions of the videotapes on or before July 8, 1997. The court grants PDM's motion in limine on the two bolt rule. If PDM wishes to respond to

the government's motion to exclude the Massachusetts standard, motion in limine to exclude certain expert opinion, and motion in limine concerning "employee" issue, PDM may file its responses on or before July 9., 1997.